## LUSTIG *v.* UNITED STATES.

No. 1389, Oct. Term, 1946. Argued April 19, 1948.—Reargued
October 19, 1948.—Decided June 27, 1949.

*Edward Halle* argued the cause and filed the briefs
for petitioner.

*Solicitor General Perlman* argued the cause for the United States. With him on the brief on the original argument were *Assistant Attorney General Quinn, Robert S. Erdahl, Irving S. Shapiro* and *Philip R. Monahan.* With him on the brief on the reargument were *Assistant Attorney General Campbell, Mr. Erdahl* and *Josephine H. Klein.*

Mr. Justice Frankfurter announced the judgment of the Court and an opinion in which Mr. Justice Douglas, Mr. Justice Murphy and Mr. Justice Rutledge join.

This is a prosecution under the counterfeiting statutes. Rev. Stat. § 5430, 35 Stat. 1088, 1116, 18 U. S. C. (1946 ed.) § 264 (now § 474). The sole question before us is the correctness of the denial of a pretrial motion, sustained by the Court of Appeals for the Third Circuit, 159 F. 2d 798, to suppress evidence claimed to have been seized in contravention of the Fourth Amendment as it is to be applied under the doctrine of *Byars* v. *United States,* 273 U. S. 28.[1]

Since the legal issue turns on the precise circumstances of this case they must be stated with particularity.

At about 2 p. m. on Sunday, March 10, 1946, Secret Service Agent Greene received two telephone calls, one from the police of Camden, New Jersey, the other from the manager of a hotel in that city, indicating violations of the counterfeiting statutes being carried on in Room 402 of the hotel. Lustig, the petitioner here, and one Reynolds were registered for this room under assumed

---

[1] After this Court denied a petition for writ of certiorari, a petition for rehearing was granted. The order entered June 16, 1947, 331 U. S. 853, denying certiorari was vacated and the petition for writ of certiorari to the Court of Appeals for the Third Circuit was granted on February 16, 1948. 333 U. S. 835.

names.  It is to be noted that the Secret Service is the agency of the Government charged with enforcement of the laws pertaining to counterfeiting.  On looking through the keyhole of the suspect room after reaching the hotel, Greene saw Lustig, two brief cases and a large suitcase, but no evidence pertinent to counterfeiting.  He questioned the chambermaid whose suspicions had led to this investigation.  She recounted the hearing of noises "like glass hitting against glass or metal hitting against metal" emanating from the suspect room.  She also remarked that she had seen what looked like money on the table.

Greene thereupon reported to Detective Arthur of the Camden police at the Camden Police Station that he had seen no evidence of counterfeiting but was confident that "something was going on."  Arthur reported the affair by telephone to his superior, Captain Koerner, at his home, who then came to the police station.  In his account of the affair, Greene gave to Koerner the names under which the occupants of the room had registered.  In reply to inquiry by Captain Koerner, Sergeant Murphy of the Camden police stated that one of the names was that of a "racehorse man or a tout or a bookie."  After verifying the names on the hotel register and on the assumption that the occupants of the room "might be trying to counterfeit race-track tickets" rather than currency, Koerner secured warrants for the arrest of persons bearing the names on the register in order to "get into that room and find out what was in there."  The offense charged against those bearing the assumed names was the violation of a Camden ordinance requiring "known criminals" to register with the local police within twenty-four hours after their arrival in town.  At about four o'clock in the afternoon of the same day, Koerner and three city detectives secured a key from the manager of the hotel and entered Room 402.  The police officers proceeded to empty the

bags and the drawers of a bureau and thus came upon the evidence sought to be suppressed. What they found indicated counterfeiting of currency rather than of race-track tickets.

During all this time, Greene had remained at police headquarters because he "was curious to see what they would find." On finding what they did find, Koerner sent word to Greene, who came to the hotel and examined the evidence in controversy. When Lustig and Reynolds eventually returned they were arrested and searched by the detectives. As various articles were taken out of their pockets, those deemed to have bearing on counterfeiting currency were turned over to Greene. He observed that the ink on a $100 bill taken from Reynolds had not been tampered with. Greene was trying to discover what had been used to make the impression on the "similitude" found in the room. After the search was completed, Greene and the city police gathered up the articles revealed by the search and carried them to the police station. Some of these articles were given to Greene before he left Room 402; all were eventually turned over to him.

We are confronted by a ruling of the District Court, sustained by the Court of Appeals, admitting the evidence. But the question before us is not foreclosed by the respect to be accorded to a ruling on an issue of fact by the trial court until analysis discloses that the ruling was merely on an issue of fact and that no issue of law was entwined in the ruling. Insofar as what the lower courts found as facts may properly be so regarded, they are to be accepted; but their constitutional significance is another matter.

On the basis of what was before him, the trial judge admitted the evidence because he did not "see any connivance or arrangement on the part of the Federal officers to have an illegal search made to get evidence they could

not secure under the Federal law." We therefore accept as a fact that Greene did not request the search, that, beyond indicating to the local police that there was something wrong, he was not the moving force of the search, and that the search was not undertaken by the police to help enforcement of a federal law. But search is a functional, not merely a physical, process. Search is not completed until effective appropriation, as part of an uninterrupted transaction, is made of illicitly obtained objects for subsequent proof of an offense. Greene's selection of the evidence deemed important for use in a federal prosecution for counterfeiting, as part of the entire transaction in Room 402, was not severable, and therefore was part of the search carried on in that room. The uncontroverted facts show that before the search was concluded Greene was called in, and although he himself did not help to empty the physical containers of the seized articles he did share in the critical examination of the uncovered articles as the physical search proceeded. It surely can make no difference whether a state officer turns up the evidence and hands it over to a federal agent for his critical inspection with the view to its use in a federal prosecution, or the federal agent himself takes the articles out of a bag. It would trivialize law to base legal significance on such a differentiation. Had Greene accompanied the city police to the hotel, his participation could not be open to question even though the door of Room 402 had not been opened by him. See *Johnson* v. *United States,* 333 U. S. 10. To differentiate between participation from the beginning of an illegal search and joining it before it had run its course, would be to draw too fine a line in the application of the prohibition of the Fourth Amendment as interpreted in *Byars* v. *United States, supra,* 273 U. S. 28.

The crux of that doctrine is that a search is a search by a federal official if he had a hand in it; it is not a

search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter. The decisive factor in determining the applicability of the *Byars* case is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it. Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been conducted entirely by State officers. Evidence secured through such federal participation is inadmissible for the same considerations as those which made *Weeks* v. *United States*, 232 U. S. 383, the governing principle in federal prosecutions.

Though state officers preceded Greene in illegally rummaging through the bags and bureau drawers in Room 402, they concerned themselves especially with turning up evidence of violations of the federal counterfeiting laws after Greene joined them. He was an expert in counterfeiting matters and had a vital share in sifting the evidence as the search proceeded. He exercised an expert's discretion in selecting or rejecting evidence that bore on counterfeiting. The fact that state officers preceded him in breach of the rights of privacy does not negative the legal significance of this collaboration in the illegal enterprise before it had run its course. Greene himself acknowledged such participation by his remark about "leaving the room after we had gathered all this evidence together."

Nor is the search here defensible as incidental to a lawful arrest. Greene never made the arrest, he knew that Lustig and Reynolds were not present when he entered their room and he had an active hand in the continuation

of the search without warrant before Lustig and Reynolds had returned. The ruling in *Davis* v. *United States*, 328 U. S. 582, does not come into play. Neither is it material that Greene may have been informed as to what he was likely to find before he joined the searchers. Vindicated anticipation of what an illegal search may reveal does not validate a search otherwise illegal. *Trupiano* v. *United States*, 334 U. S. 699, 708–9. With every respect for the rulings of the lower court, we find that the unquestioned facts disclose that the evidence on which the conviction rests was illicit and the motion to suppress it should have been granted.

*Reversed.*

Mr. Justice Black concurs in the judgment of the Court substantially for reasons set out in his dissent in *Feldman* v. *United States*, 322 U. S. 487, 494.

Mr. Justice Murphy, with whom Mr. Justice Douglas and Mr. Justice Rutledge join, concurring.

Mr. Justice Frankfurter finds it unnecessary to decide whether an illegal search by state officers bars the introduction of the fruits of the search in a federal court. I join in his opinion, and in the judgment of reversal. But my dissenting views in *Wolf* v. *Colorado, ante,* p. 25, decided this day, make clear my position on the question he reserves. In my opinion the important consideration is the presence of an illegal search. Whether state or federal officials did the searching is of no consequence to the defendant, and it should make no difference to us.

Mr. Justice Reed, with whom The Chief Justice, Mr. Justice Jackson and Mr. Justice Burton join, dissenting.

My understanding of the rule as to the use of evidence in a federal criminal trial obtained by state officers through

a search and seizure conducted by them under state authority is this.

"While it is true that the *mere* participation in a state search of one who is a federal officer does not render it a federal undertaking, the court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods." *Byars* v. *United States,* 273 U. S. 28, 32. In the *Byars* opinion this Court went on to say that the federal government had the right "to avail itself of evidence improperly seized by state officers operating entirely upon their own account. But the rule is otherwise when the federal government itself, through its agents acting as such, participates in the wrongful search and seizure." P. 33. This is the rule which the Court reaffirms today.

It is the application of that rule to the facts of this case which causes me to dissent. Although it may seem only a difference of view as to the facts of a particular case, it becomes important in the administration of the criminal law. If federal peace officers are to be restricted in their duties to the extent indicated in the opinion, they should have full warning so that their work in detecting crime will not be frustrated through the officer's inadvertence in accepting evidence turned over to him by state officers. The trial court found that Greene did not participate in the search and seizure. We should accept that finding. If we undertake to reexamine the testimony to see whether there was participation by Greene, I should reach the same conclusion as the lower courts did.

In my view Secret Service Agent Greene did not participate in this search and seizure and the motion to suppress the evidence obtained was properly overruled in the trial court, and the trial court's action was properly sustained in the Court of Appeals for the Third Circuit.

The Court accepts "as a fact that Greene did not request the search, that, beyond indicating to the local police that there was something wrong, he was not the moving force of the search, and that the search was not undertaken by the police to help enforcement of a federal law." The record shows clearly to me that Agent Greene did not participate in the search and seizure.

Only state police entered the room of Lustig, opened his brief cases and found all the articles useful in counterfeiting. It was not until after all the articles were found that were offered in evidence that Agent Greene was called.[1] It was stated thus in the brief for appellant: "When he arrived at the hotel, all of the material that had been taken out of the brief case was on the bed. Capt. Koerner and Sgt. Murphy then put the exhibits back in the brief cases." This was Greene's testimony. Greene examined the articles that had been taken by the state police from the satchels. He then left the room and returned as Lustig and his companion Reynolds were in the act of opening the door to Room 402 where the state officers were. The state officers then arrested Reynolds and Lustig on a warrant for a state offense. The prisoners were searched. On Reynolds a $100 bill was found that was shown to Agent Greene by Captain

---

[1] Testimony of Captain Koerner:

"Q. After you discovered these articles, what did you do?

"A. I called agent Greene, of the United States Secret Service.

.          .          .          .          .

"Greene came over in the neighborhood of five o'clock after we made a thorough search and found all this evidence I have presented."

Testimony of Sergeant Murphy:

"Q. When did Mr. Greene come there?

"A. After we searched the room, seeing what was in it, and finding the three notes, I talked to Captain Koerner and I told him we had enough to charge him with a Federal violation, and I called Mr. Greene from the hotel and explained to him over the telephone just about what we had found, and he came over later."

Koerner.[2] The $100 bill had not been tampered with, was not evidence against Lustig and has nothing to do with the case against him.

Unless the fact that Agent Greene looked at the evidence secured by the state police before it was removed from the room involves the United States in the search and seizure, the lower courts were correct in holding that Agent Greene had no part in the search and seizure. Greene did not "share in the critical examination of the uncovered articles as the physical search proceeded." [3] The search had ended before he came into the room. The subsequent arrest, examination, and the $100 bill found on Reynolds had nothing to do with the alleged unlawful search and seizure. The search and seizure had run its course and we should not hold that the appearance of a federal officer at the place of unlawful search and seizure after evidence has been found makes him a participant in the act. This evidence should not be suppressed and the conviction of Lustig should be affirmed.

---

[2] Testimony of Agent Greene:

"Q. There was a hundred dollar bill found on Mr. Reynolds?

"A. Well, a new one.

"Q. Did you match the hundred dollar bill with that impression?

"A. No, sir. I observed that the ink on this new hundred dollar bill had not been tampered with. In other words, the bill was new in appearance and I concluded it was not the pattern bill from which this hundred dollars was made.

"Q. You gave the hundred dollars did you to Mr. Reynolds?

"A. No, sir. At the time I looked at the bill it was in Captain Koerner's possession."

[3] Opinion of MR. JUSTICE FRANKFURTER, *ante*, p. 78.