### ROBERTA JARQUIN V. STATE.

No. 24771. June 7, 1950.
Rehearing Denied October 11, 1950.

*Leonard Brown* and *Maxwell Burket,* San Antonio, for appellant.

*George P. Blackburn,* State's Attorney, Austin, for the state.

GRAVES, Judge.

Appellant was charged with producing an abortion upon a pregnant woman and destroying the life of the fetus in the womb of said woman, and upon her conviction she was awarded a term of five years in the penitentiary.

Appellant's Bills of Exception Nos. 1, 2, and 3 related to what is termed an "unlawful search" of a certain house on the Goeth Road, just outside the limits of the city of San Antonio. The testimony shows that three officers, a justice of the peace, an investigator for the district attorney's office, and a deputy sheriff, had received a call of some kind, the character of which is not shown in the record, and they appeared at a house called a "shack" with some broken windows covered with curtains. Upon approaching such house, one of the officers smelled ether and blood, and heard someone groaning. While looking at the house, a Mrs. Solis pulled back the curtain from a window and the officers, upon looking in, saw appellant be-

tween the legs of this groaning woman, with a metallic instrument in her hand. Upon a request to open the door by Mrs. Solis and an officer, the appellant opened the door to said house, and the officers found this unconscious woman on an operating table groaning; and many instruments usable in performing an abortion, as well as a quantity of blood and some ether in a can were in said room.

The victim of this abortion testified that she was pregnant about three months, and that she first contacted a doctor, who confirmed her suspicions; that she then contacted appellant who agreed to relieve her of her pregnancy, and she paid appellant the sum of $125.00; that on the day in question, she came to appellant's house, which was shown to be some 10 or 12 miles away from this shack, and there she was given some kind of an injection and then taken by appellant to this shack, where she was given another injection, and finally given ether; that she did not know anything else until she awakened in the Robert B. Green Hospital; that she was then no longer pregnant and that her menses afterwards returned.

The officers testified to the copious blood found in a bucket mixed with water and a piece of flesh therein, as well as blood-stained instruments hidden under a bed in such shack, and also to seeing blood on the floor.

All of these things were introduced in evidence, and are objected to under the claim that the officers obtained the same in violation of the law by an unlawful search.

Neither the ownership nor the possession of this shack is shown to have been in the appellant. She lived some miles away therefrom. Mrs. Solis seemed to have exercised some dominion over this place, and she obtained entrance for the officers. We find her pulling back the curtain so that the officers could actually see the appellant in action; and we also find her telling appellant to open the door and let the officers in. Regardless of who owned or occupied the house, appellant is not shown to have done so, and she had no reason to complain of the search of another's house. As to the arrest, Articles 212 and 213, Vernon's Ann. C. C. P., provide for an arrest without a warrant by a peace officer or a magistrate when a felony is committed within his view, and the presence of the officers not being shown to be unlawful, the arrest of appellant was also lawful. The arrest being lawful, it carried with it the privilege of search. We are cited herein to many cases relating to violations of a

federal statute and prosecutions in Federal Courts relative to unreasonable searches and seizures as alleged precedents holding this present testimony inadmissible.

We note from the case of Wolf v. Colorado, 338 U. S. 25, 93 L. Ed. 1782, as well as that of Lustig v. United States, 338 U. S. 74, 93 L. Ed. 1819, that the Supreme Court of the United States has held that in a trial in a state court the Fourteenth Amendment does not prohibit the introduction of testimony found by means of an unreasonable search and seizure as contrary to due process of law.

It is also complained because the different instruments seized were brought before the jury and identified by a physician as useful in matters such as herein charged. It will be remembered that this was a case of circumstantial evidence, and it seems to us that such instruments, some of them covered with blood, taken into consideration with other circumstances, tended strongly to show the commission of this charged offense. We think the surrounding facts found at the time this unfortunate lady was undergoing some kind of manipulation of her body could certainly aid the jury in determining what appellant was doing to this unconscious woman at the time appellant was seen over her body.

Bill No. 5 relates to an isolated portion of the court's charge wherein it was said that "by the term 'abortion' is meant that the life of a fetus or embryo shall be destroyed in a woman's womb, or that a premature birth (thereof) be caused." This quotation is a part of the statute, Art. 1191, Vernon's Ann. P. C. However, it is noted that in the indictment, as well as in the portion of the charge applying the law to the facts, no mention is made of the latter phrase relative to causing a premature birth of an embryo; and it was emphasized therein that they must find, beyond a reasonable doubt, that a fetus was destroyed in the woman before a conviction could be had.

Complaint is made of the statement of the district attorney when he referred to the numerous metallic instruments found on the scene of this alleged offense as "death dealing instruments", as shown in Bill No. 14. It is shown by said bill that the trial court immediately instructed the jury to disregard such statement. The testimony did show that many of such instruments were useful in opening the private parts of a woman, that some of them covered with blood, that portions of human flesh were found in this room, and that a placenta and an um-

bilical cord were also there found, as well as a large quantiy of blood; and it seems fairly evident that a fetus was destroyed in the body of this woman by the same certain bloody instruments. We see no serious incurable error shown.

Complaint is also made because of the fact that the district attorney saw fit to say:

"Mr. Brown has complimented me very graciously. He is the outstanding criminal lawyer of San Antonio about whose health all criminals inquire before they do anything wrong."

Again the careful trial court instructed the jury to disregard such statement. It is not shown that such remark was not in answer to any statement made by appellant's counsel. Instead, it is shown by the complained of statement that such seemed to be in reply to something said by Mr. Brown relative to the district attorney as follows:

"That Wm. N. Hensley was the Sir Gallahad of the legal profession, an ambitious young man, and a diligent prosecutor, who, to obtain the first abortion conviction in the history of Bexar County, will do anything."

We think that the remark complained of was probably called for by the statement of counsel. Surely the court's prompt withdrawal thereof would leave the matter without error.

It is noted that the trial court correctly charged the jury upon the allegation in the indictment and that was the destruction of the life of the embryo.

We have not written on the bills seriatim, but have endeavored to utilize appellant's brief as to the ones therein discussed. All bills not written on are overruled.

Mention is made of the severity of this verdict, it being the highest allowed by law, namely, five years. The enormity of the crime that the jury said this appellant had committed and the danger, not only to appellant's victim but also to society, and the circumstances shown to have surrounded this act, certainly merits punishment, and we see no disparity between the facts and the verdict.

The judgment will be affirmed.

ON MOTION FOR REHEARING.

WOODLEY, Judge.

Regarding the possession and control of the premises where the abortion was shown to have occurred, our attention is directed to the following testimony of the witness Marjorie Benavides: "I do not know Mrs. Roberta Jarquin personally but do know her by sight, and see her now in the court room. I have seen her at that shack, sometimes every day and sometimes twice a day. I have seen her just at any hours. It did not make any different what hours, and that was true on or about the 2nd day of April, 1949."

We are unable to agree with appellant's contention that such evidence shows possession or control of the premises searched to have been in appellant. But in any event, the offense being committed within view of the officers called to the scene they were authorized to arrest without warrant the offender, and as an incident to the arrest, to search the premises. The evidence thus obtained was admissible.

Bill of Exception No. 4 shows that many articles, instruments and paraphernalia found in the "shack" and seized by the officers were exhibited before the jury. Appellant complains of our disposition of said bill, and contends that much of such paraphernalia did not tend to illustrate any point in the case and had no probative value. It now appears that appellant's chief complaint is as to the arrangement of the articles in view of the jury and their exhibition in the courtroom throughout the trial.

Appellant concedes that some of the articles so displayed were admissible and it is not shown which of the articles are claimed to be inadmissible, nor is it shown that any article claimed to be inadmissible was of a character such as might inflame the minds of the jury, or prejudice the rights of appellant. We remain convinced that no error is shown by this bill.

The indictment charged that appellant committed the abortion by destroying the life of the fetus in the womb.

Under the court's charge, the jury was required to so find in order to convict.

Appellant contends that the evidence failed to establish the destruction of a live fetus in the womb rather than the pro-

ducing of a premature birth thereof, another and different manner of violating the abortion statute.

The trial court required the jury to find beyond a reasonable doubt that the offense was committed by the means charged in the indictment, that is, that the defendant destroyed a live fetus while in the womb of the woman. And at the request of appellant, the jury was instructed that they could not convict upon a finding only that a premature birth was caused.

The victim of the abortion testified that she was about two months advanced in pregnancy at the time of the abortion.

Dr. Boyd testified that she was a little over two months pregnant when he examined her in March, and that pregnancy had terminated when he saw her in April at the hospital and found her under the influence of ether and bleeding from the vagina.

Dr. Todd testified concerning the instruments found at the "shack," and the exhibits brought to him for examination, including a piece of the umbilical cord and a placenta badly shredded and torn. He testified that the placenta is one of the last organs formed in pregnancy, and is located on the wall of the uterus, its purpose being to protect the fetus from injury.

The fetus, at two or three months, he described as about 1/12th of a centimeter in size, extremely delicate and a very fragile piece of tissue.

Referring to Exhibit No. 5, Dr. Todd testified:

"This Exhibit No. 5 is called a curette and it is an instrument used for insertion into the cavity of the uterus or womb for the purpose of scraping out the contents.

"The embryo is carried in the womb of a woman, and the curette is used to scrape out the womb.

\* \* \* \* \* \* \* \* \*

"This Exhibit No. 5, if applied to a fetus of two or three months could spread it all to pieces. It depends on the was it is used. It could mash it to a pulp. That is one of the biggest I have ever seen."

Officer Jay Higdon testified that Exhibit 5 and other tools

and instruments were found under the mattress of the bed; that the instruments were bloody and had flesh on them.

Such testimony, together with the other facts and circumstances, this being a circumstantial evidence case, are sufficient to show that the life of the fetus was destroyed in connection with the abortion, and to sustain the jury verdict under the court's charge.

Appellant's motion for rehearing is overruled.

Opinion approved by the court.