UNITED STATES of America

v.

James David EVANS.

No. 25001.

United States District Court
D. Maryland,
Criminal Division.

Jan. 13, 1960.

---

Leon H. A. Pierson, U. S. Atty., John R. Hargrove, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Milton B. Allen, Baltimore, Md., John A. Shorter, Jr., Washington, D. C., for defendant.

CHESNUT, District Judge.

In this case the defendant, James David Evans, was indicted by the Grand Jury in three counts for (1) removing and concealing non-tax paid liquor; (2) possession of 31½ gallons of non-tax paid liquor and (3) possession of that amount of liquor and 4,825 pounds of granulated sugar intended for use in violation of the federal liquor laws, namely 26 U.S.C.A. §§ 5601(a) (12); 5205(a) (2); 5604(a) (1) and 5686(a), on September 20, 1959 in a garage in the rear of 1522 Harlem Avenue, Baltimore, Maryland. The case came on for trial on November 19, 1959 and at the beginning thereof the defendant, by his counsel, filed a motion to suppress the evidence then in possession of the Government consisting of the liquor and sugar mentioned in the indictment. For convenience, the ruling on the motion was deferred until the completion of all the testimony submitted in the case.

The ground of the motion to suppress was based on the charge that the discovery of the evidence was due to an unlawful arrest of the defendant, and seizure of the materials in the garage by Baltimore City police officers and their subsequent turning over of the evidence to a representative of the Alcohol & Tobacco Tax Unit. From the testimony given at the trial of the case I find the following facts:

1. On September 20, 1959 a Baltimore City police officer, Samuel A. Portera, on patrol duty in the day time, was instructed to look out for and possibly find a pistol or firearm which had been used in a murder very recently theretofore committed in the immediate neigh-

borhood of the officer's "beat". Having this in mind, Portera saw the defendant leaving and closing the door to the garage above mentioned, and holding a wrapped package in his hand. Portera, an officer having only a comparatively short prior experience as a patrolman, asked the defendant, Evans, what he had in the package. Evans demurred to answering saying that it was something that belonged to him and that the officer would not be interested. He put the package in an automobile standing in the alley by the garage door. Portera again said that he wished to see the package and again Evans put him off but finally after further requests or insistence by Portera, Evans took the wrapped package out of the car and himself unwrapped it and showed it to the officer who found it to be what he considered a half gallon of so-called moonshine liquor. The officer did not use any force or threats of force but he was in uniform with customary police equipment.

2. Having thus found that the defendant was apparently violating the Maryland liquor tax laws and evidently suspecting that there might be a larger amount of non-tax paid liquor in the garage, Portera then asked Evans to open the garage. Again Evans demurred but finally procured a key from the car and opened the garage door. Portera did not enter the garage but saw through the open doorway what appeared to be a large supply of cartons containing Mason jars, frequently used for non-tax paid liquor, and also an apparent large quantity of sugar in bags. Thereupon he arrested Evans and took him to the police station house and then summoned his superior officer, Sgt. Schraml, and informed him in substance what had occurred.

3. Sgt. Schraml knew Evans well by sight and in relation with one or more garages in the vicinity of where he had been arrested. Sgt. Schraml immediately inquired from Evans what he knew about the liquor and sugar in the particular garage and Evans promptly replied that it was not his. Evans was,

however, booked at the station house on suspicion of possessing non-tax paid liquor. Sgt. Schraml then went with Portera to the garage, opened it, saw at once the presence of the non-tax paid liquor in cartons and a very large quantity of sugar in bags partially concealed by heavy construction paper. He thereupon went to the police call box nearby and informed Lt. Deuchler of what he had found and requested him to notify the proper authorities. Deuchler then telephoned various State authorities, including the Baltimore City Crime Laboratory, and Agent Mueller of the Federal Alcohol Tax Unit, and suggested to the latter that if interested he should visit the garage. Sgt. Schraml then went back to the garage and awaited others. The first to arrive was the Crime Laboratory photographer who proceeded to take pictures of the outside and inside of the garage, removing the cover on the sugar bags for a better view of the bags of sugar. While he was doing this, Agent Mueller came to the garage, met Sgt. Schraml, was told in substance of the discovery of the alcohol and sugar and went into the then open garage, saw at a cursory glance its contents but went out again to allow the photographer to complete his work. Schraml then asked Mueller if he was willing to take over the matter for federal prosecution and received his assent after Mueller had opened one of the jars and verified its contents as alcohol with no tax stamps. Schraml then handed the key to the garage to Mueller and retired; and with the assistance of another federal agent who had later arrived, Mueller made an inventory of the quantity of liquor and sugar consisting of 31½ gallons of non-tax paid liquor and 4,825 pounds of sugar, the latter apparently partially damaged and no longer marketable. Later the same day the liquor and sugar were removed and destroyed in accordance with the usual federal procedure and requirements. Still later the same day Mueller personally interviewed Evans and was told by him that he, Evans, did not own the liquor or sugar

and that his only relation to the matter was that he had originally rented the garage from the owner of the premises but had subsequently re-rented the garage at $7 per month to each of two unnamed and unidentified persons, one for the storage of liquor and the other for the storage of sugar.

4. It was not until the defendant's motion to suppress the evidence was filed that there had been any admission by Evans that he owned or had any interest in or possession of the liquor and sugar, other than his obvious possession of the half gallon of liquor disclosed when he opened the package containing it. Until the motion to suppress was filed Evans had made no assertion of ownership and it is clear that until then he had no standing to assert an invasion of his rights by his arrest, and the seizure of the articles unless the circumstances of the discovery by Portera so colored the whole discovery that it amounted to an unreasonable search.

The principal and evidently controlling feature of the case is whether the motion to suppress should be granted or overruled. The answer to this requires consideration of and an answer to three particular questions, which are:

(1) Was the arrest, and search and seizure of the liquor and sugar, unreasonable and illegal and thus contrary to the 4th Amendment; and

(2) if so, was the resulting evidence inadmissible in a federal prosecution even if no federal agent was a participant in the original arrest and search, either directly or indirectly; and

(3) under the particular circumstances of this case, was the federal agent Mueller a participant, directly or indirectly, in an unreasonable search by the City police.

■ While not free from doubt, I think the answer to the first question must be "Yes". Clearly the police officer had no probable cause for verbally insisting that Evans open the package and disclose its contents. While the officer was properly seeking to find a firearm

used in a recent homicide in the neighborhood, the appearance of the package, according to the evidence, was not of itself a reasonable basis for insisting that it be opened. If the opening of the package by the defendant had been purely voluntary, it is clear enough that it would not have been an unlawful search or seizure. The testimony of the defendant on this point was in effect that the officer's insistence to see the contents of the package was of a more menacing nature than as described by the officer. After hearing both as witnesses, I accept the testimony of the officer as more credible; but nevertheless I think the circumstances savored more of implied compulsion than free and voluntary action by the defendant.

■ After the package was opened, of course there was basis for arresting the defendant for violation of a state law, (Art. 2B, § 3(a) Md.Code of 1957) in the presence of an officer; but still I think it cannot be said that it gave probable cause for the further insistence by the officer that Evans open the garage door. Upon the opening of the garage door and disclosure of its contents it can be reasonably said that there was further evidence of violation of state law warranting the arrest of the defendant. But the question is whether the initial wrongful insistence by the police officer to a man who, according to his evidence, was of limited education and ability to resist an officer's unauthorized request, does not stamp the whole following developments with attributes of an unreasonable search. Certainly the officer's insistence here was not what could be popularly called outrageous but in the circumstances, viewing the relative apparent situation of the officer and Evans, I think it was more than what could be fairly called "peaceful persuasion". Realistically considered, it is quite probable that inquisitions of this nature often do occur in the enforcement of laws by the police for the very general good purpose of preserving law and order; but nevertheless the courts must be vigilant in preserving the rights of citizens

against unauthorized inquisition or interference with personal affairs by the police.

■ I think the answer to the second question must be "No". I have long understood the federal law of evidence applicable to a similar situation to be that evidence although developed by an unreasonable search by state officers, is not excludable if otherwise relevant in a federal prosecution, unless federal agents have participated directly or indirectly in the unreasonable search. In considering this subject which has recently been much discussed, I think it should be borne in mind that what we are dealing with is simply a rule of evidence, and not directly a constitutional problem; and I think it tends to confusion of thought when we get into a discussion of constitutional law as affecting the power to control evidence on the one hand in the federal courts, and on the other, in the state courts. Prior to the decision of the Supreme Court in the case of Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L. Ed. 652, it was the generally considered proper rule of evidence that it should not be excluded because it had been improperly or illegally obtained. This was the view of the majority of the state courts prior to the Weeks case and has been the view of the majority of the state courts (including Maryland, see Meisinger v. State, 1928, 155 Md. 195, 141 A. 536, 142 A. 190; Lawrence v. State, 1906, 103 Md. 17, 63 A. 96, but as to misdemeanor only, see Art. 35, § 5, Md. Code 1957), since then.[1] And this was the view of the more widely known and approved text writers. 8 Wigmore on Evidence (3d ed. 1940), §§ 2183 et seq., p. 4; 1 Greenleaf on Evidence (16th ed. 1899) s. 254(a), p. 393.

In the Weeks case the Supreme Court decided that evidence secured by unreasonable action of state agents should not be excluded but evidence unlawfully obtained by agents of the federal government should be excluded. The reason given by the court was that to admit the evidence would be to sanction a violation of the constitutional provision by federal agents. The doctrine of the Weeks case has been adhered to in numerous subsequent decisions of the court. In some, where the circumstances showed participation by a federal agent, the evidence was excluded; but in others where there was no such participation, it was admitted. Most, or at least some, of the cases in the Supreme Court are: Burdeau v. McDowell, 1921, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048; Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520; Gambino v. United States, 1927, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293; Feldman v. United States, 1944, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408; Wolf v. People of State of Colorado, 1949, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782; Lustig v. United States, 1949, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819.

And of course this same principle has necessarily been applied time and time again in the last fifty years by practically all federal appellate courts and district courts. Particularly it is to be noted that the principle has been so applied in three comparatively recent cases in the Fourth Circuit Court of Appeals: Sutherland v. United States, 1937, 92 F.2d 305 (opinion by Judge Parker); Kitt v. United States, 1942, 132 F.2d 920 (opinion by Judge Dobie); Wheatley v. United States, 1946, 159 F.2d 599 (opinion by Judge Soper).

The only exception to the wide prevalence of the rule as applied in the federal appellate courts is found in the very recent case of Hanna v. United States, 1958, 104 U.S.App.D.C. 205, 260 F.2d 723 and its more recent follower, White v. United States, D.C.Cir., 271 F.2d 829. The interesting opinion by Judge Hastie in the Hanna case seems to proceed on the view of the court that while the

---

1. See the elaborate documentation by appendix to the opinion of Mr. Justice Frankfurter in Wolf v. People of State of Colorado, 1949, 338 U.S. 25, 69 S. Ct. 1359, 93 L.Ed. 1782.

Supreme Court has heretofore uniformly applied the rules as above stated, expressions of individual Justices in particular cases, sometimes in concurring opinions and sometimes in dissenting opinions, may indicate that the distinction between federal and state agency participation in an unreasonable search and seizure is not likely longer to be considered significant. But I note that in even more recent federal appellate decisions both in the 5th and 7th Circuits, the Court had noted but has not approved the present departure made by the Hanna case. Kendall v. United States, 5 Cir., 272 F.2d 163, and United States v. Camara, 7 Cir., 271 F.2d 787.

■ In view of the many prior decisions of the Supreme Court upon the application of the particular rule of evidence and those in the 4th Circuit in accordance therewith, I would not feel free to follow the new doctrine of the Hanna case; but even if the question could properly be regarded as an open one, I think there are still important considerations both in law and policy to support the present rule. As pointed out, what we are dealing with here is simply a rule of evidence. I think the present tendency with regard to judicial evidence is to emphasize in importance the question of its relevancy and to narrow rather than expand exclusionary exceptions. Rule 26 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., provides: " * * * the admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." At common law evidence otherwise relevant was not to be excluded because it had been improperly obtained. There were other remedies available by law for redress against the transgressor who had improperly obtained it, and Congress has the power if experience indicates the necessity therefor, to further modify the rules of evidence in the federal courts subject only to constitutional limitations; as seemingly has been done with respect to evidence obtained by unlawful wiretapping. See Benanti v. United States, 1957, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126. The exclusion of such evidence in the federal courts where federal agents had been the transgressor has been established as a result of experience in our dual federalism by the Supreme Court, based on the public policy involved in forbidding the government itself to take advantage of transgressions of the 4th Amendment against unreasonable searches by its own agents. The effect was to provide another method of enforcement of the constitutional provision by establishing as an exception to the general rule the inadmissibility of such evidence which would tend to operate as admonitory and disciplinary action against improper and unconstitutional activities of federal agents. But it was recognized by the Supreme Court in Wolf v. People of State of Colorado, supra, that this exemplary doctrine for the federal courts was not binding in state judicial procedure and it will seem clearly to follow that enforcing the exclusionary rule for the federal courts would not itself constitute admonitory or disciplinary action against state officials, unless likewise applied by the state courts.

In considering the public policy advocated by the Hanna case, realistic thought should be given to its probable effect in the judicial enforcement of federal criminal law. The doctrine of the Hanna case would seem to be that any and all evidence illegally obtained by state police, although without any direct or indirect participation of federal agents, must be excluded in the federal prosecution of offenses against the United States. The importance of such a broad principle may be of little consequence in cases, such as the instant one, involving only a comparatively small amount of tax dollars incident to federal liquor violations; but it might well be of much greater significance with re-

spect to the prosecution of federal offenses involving the national security.

I have given consideration to the proper answer to be made to the third question, that is, whether under the particular facts the federal agent Mueller was directly or indirectly a participant in an unreasonable search, contrary to the 4th Amendment. At the hearing of the case on November 19, 1959 the contention of counsel for the parties was not directed to that question, the principal contention of counsel for the government being that the proof did not show an unreasonable arrest and search and the principal contention of counsel for the defendant being their reliance upon the Hanna case. However, on the subsequently filed briefs an argument was made by counsel for the defendant to analogize the facts of the instant case to that of Lustig v. United States, 1949, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819. I thought the matter of sufficient importance to have a more thorough statement in the evidence not only of the precise facts of the case and with special reference to federal agent Mueller, but also definite proof as to what general relations there were in Baltimore City between state and federal officers charged with the enforcement of the liquor laws of the state and federal government respectively. Therefore at the last hearing on the subject at my suggestion, all the witnesses who had testified at the original hearing were recalled and in addition the supervising agents of the liquor tax laws of the Federal Alcohol Tax Unit and the corresponding State agency. The Baltimore City police officers are under the control of the State Government.

■ It appears that one point advanced by counsel for the defendant is what is sometimes referred to as "collaboration" between state and federal agencies with respect to criminal prosecutions in the enforcement of liquor laws. Just what is meant or implied by the term "collaboration" is prehaps not precisely clear. But however that may be, the uncontradicted evidence in this case is that there was no understanding or agreement, either express or implied, between the federal and state agencies with respect to one acting for the other or acting jointly in the initiation of search or consequent prosecution. But this does not mean that the respective agencies do not at times exchange information which they respectively have received or possess regarding enforcement. In itself such exchange of information is commendable and not criticizable in the interest of law enforcement. To this end it is not unusual where a state agency has discovered a violation, without intervention by the federal officers, to ask the federal government whether they care to adopt the case for federal prosecution, and that in practice that is often done where the quantity of non-tax paid liquor that is found by the state police is considerable in amount, because in the opinion of the state officers they think the facilities for more effective enforcement by the federal government are greater. But it is clear there is no understanding or agreement that the federal officers are expected or required to adopt any discovery by the state police; nor is there any evidence that they habitually do so adopt such discoveries in any or all cases. Such co-operation or, if so-called collaboration, does not render evidence obtained by the state police, though unreasonable, inadmissible in the federal courts, where there has been no participation by federal agents in the unreasonable search. See Kitt v. United States, 4 Cir., 1942, 132 F.2d 920 (decided after Sutherland v. United States, 4 Cir., 1937, 92 F.2d 305); Wheatley v. United States, 4 Cir., 1946, 159 F.2d 599, and Shurman v. United States, 5 Cir., 1955, 219 F.2d 282; United States v. Scotti, D.C.S.D.Tex.1950, 102 F.Supp. 747, affirmed 5 Cir., 1952, 193 F.2d 644.

The main reliance on this third point in the case by the defendant is placed on the Lustig case, supra, where on the facts the majority of the court, in an opinion by Mr. Justice Frankfurter, held that there was evident participation in the unreasonable search by a Federal Treasury Secret Service Agent, an ex-

pert in evidence as to counterfeiting. Of course that being the most recent decision of the Supreme Court upon the subject, I should and of course would at once follow it if the facts in the instant case are substantially identical therewith or similar in principle. This requires a critical comparison of the evidence in the instant case with that in the Lustig case as more particularly set out in the opinion of the court. For exactness, reference must, of course, be made to the facts as stated in the opinion of the court.[2]

As I read the Lustig case the decisive factor was whether Greene had actively and effectively participated in making the search for the incriminating counterfeiting evidence which he was best qualified to do as an expert; and the holding in the case was that on the facts stated he had so participated while the search was in progress and before it had been concluded. As the decision turned on the judicial view of the evidence itself, it was, as the opinion notes, stated with "particularity", and I think in this connection it is appropriate as emphasis of

2. The facts as stated by Mr. Justice Frankfurter are (338 U.S. 74, 75, 69 S. Ct.1372) as follows:

"At about 2 p. m. on Sunday, March 10, 1946, Secret Service Agent Greene received two telephone calls, one from the police of Camden, New Jersey, the other from the manager of a hotel in that city, indicating violations of the counterfeiting statutes being carried on in Room 402 of the hotel. Lustig, the petitioner here, and one Reynolds were registered for this room under assumed names. It is to be noted that the Secret Service is the agency of the Government charged with enforcement of the laws pertaining to counterfeiting. On looking through the keyhole of the suspect room after reaching the hotel, Greene saw Lustig, two brief cases and a large suitcase, but no evidence pertinent to counterfeiting. He questioned the chambermaid whose suspicions has led to this investigation. She recounted the hearing of noises 'like glass hitting against glass or metal hitting against metal' emanating from the suspect room. She also remarked that she had seen what looked like money on the table.

"Greene thereupon reported to Detective Arthur of the Camden police at the Camden Police Station that he had seen no evidence of counterfeiting but was confident that 'something was going on.' Arthur reported the affair by telephone to his superior, Captain Koerner, at his home, who then came to the police station. In his account of the affair, Greene gave to Koerner the names under which the occupants of the room had registered. In reply. to inquiry by Captain Koerner, Sergeant Murphy of the Camden police stated that one of the names was that of a 'racehorse man or a tout or a bookie.' After verifying the names on the hotel register and on the assumption that the occupants of the

room 'might be trying to counterfeit race-track tickets' rather than currency, Koerner secured warrants for the arrest of persons bearing the names on the register in order to 'get into that room and find out what was in there.' The offense charged against those bearing the assumed names was the violation of a Camden ordinance requiring 'known criminals' to register with the local police within twenty-four hours after their arrival in town. At about four o'clock in the afternoon of the same day, Koerner and three city detectives secured a key from the manager of the hotel and entered Room 402. The police officers proceeded to empty the bags and the drawers of a bureau and thus came upon the evidence sought to be suppressed. What they found indicated counterfeiting of currency rather than of race-track tickets.

"During all this time, Greene had remained at police headquarters because he 'was curious to see what they would find.' On finding what they did find, Koerner sent word to Greene, who came to the hotel and examined the evidence in controversy. When Lustig and Reynolds eventually returned they were arrested and searched by the detectives. As various articles were taken out of their pockets, those deemed to have bearing on counterfeiting currency were turned over to Greene. He observed that the ink on a $100 bill taken from Reynolds had not been tampered with. Greene was trying to discover what had been used to make the impression on the 'similitude' found in the room. After the search was completed, Greene and the city police gathered up the articles revealed by the search and carried them to the police station. Some of these articles were given to Greene before he left Room 402; all were eventually turned over to him."

that point to note that on the same evidence there was a strong minority view. Of course this does not in any way minimize the weight of the majority opinion but I think it does emphasize the necessary particularity of the evidence in the case, and requires a careful and critical comparison of the facts in the instant case with those in the Lustig case. I have therefore above endeavored to state the facts in the instant case with the same degree of particularity for comparison with those in the Lustig case.

With this comparison in mind, the decisive factor in the instant case is that the search by the state police had been completed before Mueller arrived on the scene and took any action in the matter. It was the results of the completed search by the state police that were tendered to Mueller for federal prosecution. The nature of the incriminating evidence as to liquor violations both federal and state was apparent to the state police at a glance or at least even on the most superficial inspection and they needed no expert assistance from a federal officer to make that determination. With the completion of the work of the City Crime Laboratory photographer the case was complete for state prosecution or for federal prosecution. The only decision made by Mueller was that he accepted the evidence in the condition found and tendered to him by the state police.

There was no evidence of any collusion between state and federal officers with regard to this particular search or other liquor law cases. The very nature of the circumstances under which the state police made their discovery is sufficient to preclude any suggestion that the federal agents had instigated or inspired Officer Portera's action, which indeed was on his part largely accidental rather than intentional. Mueller knew absolutely nothing about the matter until he arrived at the garage in response to the telephone call which merely invited his attendance, if interested, at a particular place. It is also entirely clear on the evidence that Mueller's visit to the garage, pursuant to the telephone call, was not in consequence of any understanding or agreement between state and federal officers that government officers had agreed to do so. It is also important to note that the state police were acting on their own initiative and under their own conception of their duties under the Maryland law even if mistaken as to the lawfulness of the origin of their discovery. And I think it is not without some significance in this case that Mueller was invited to attend only after the defendant Evans had stated to Sgt. Schraml that the liquor and sugar did not belong to him. The protection of the 4th Amendment is for the benefit of a person whose private interests are invaded. Kitt v. United States, supra; and Shurman v. United States, supra.

The Lustig case again affirms in principle the doctrine of the Weeks case and its successors, including Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520, that evidence is not inadmissible in a federal court although unreasonably obtained by state officers, if a federal agent was not a participant directly or indirectly in the unlawful search. And I apply this same principle here because I conclude that it is also applicable to the facts of the instant case which, in my opinion, are materially different from those in the Lustig case with respect to the facts regarding the search. Therefore, I conclude that the motion to suppress the evidence must be and it is hereby *overruled*.

In reaching this conclusion I bear in mind that the case involves two very important principles. One is that the important protection of the citizen against invasion of his rights under the 4th Amendment can and should be effectively secured by the refusal by the federal courts to permit the prosecuting government to avail itself of actions of its agents in securing evidence contrary to the Amendment. The other is that, absent such wrongful action by its own agents, the government should not be unnecessarily hampered in the enforcement of its criminal law which is, of course, enacted for the benefit of its citizens.

I think both these principles can be effectively preserved without sacrificing either for the other by proper judicial determination of the facts in each case with respect to whether the government agents have in fact participated in the wrongful search. In weighing such evidence it is important that the evidence should be considered with scrupulous care not to exonerate its agents from blame by making merely fine distinctions; and likewise the agent should not be considered at fault when he has accepted the case for federal prosecution after the state police have completed a search prior to his participation.