UNITED STATES of America, Plaintiff,

v.

$22,287.00 IN U. S. CURRENCY,
Defendant.

Civ. No. 80–10147.

United States District Court,
E. D. Michigan, N. D.

July 29, 1981.

Michael J. Hluchaniuk, Asst. U. S. Atty., E. D. Michigan, Bay City, Mich., for United States of America.

Thomas D. Burkhart, of Jerome P. Burns, P.C.; Claimant, Saginaw, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

### I. *Introduction*

The government, as plaintiff, filed this civil action on October 1, 1980 to forfeit the amount of $22,287.00 in U.S. currency pursuant to 21 U.S.C. § 881(a)(6). The action is an outgrowth of the criminal case of *United States v. Montez*, no. 80–20013, wherein the defendant, Jesse Montez, was found guilty of conspiracy to distribute heroin and possession of heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846.

On December 9, 1980, Jerome E. Burns, Attorney, P. C., assignee of defendant Montez, as claimant, answered the government's complaint for forfeiture contesting its legal and factual basis.

On February 11, 1980, subsequent to the jury verdict in *United States v. Montez, supra,* the Court heard oral argument in this matter. At the request of the parties, the matter was then submitted to the Court for decision on a stipulated statement of facts, briefs, and oral argument. Beyond the evidence submitted at the criminal trial of Jesse Montez, no additional proofs were presented.

The Court is now prepared to decide whether the $22,287.00 in U.S. currency should be forfeited or returned to its legal owner.

### II. *Facts*

As gleaned from the stipulated statement of facts and the evidence presented in *United States v. Montez, supra,* the following facts are relevant to a decision in this matter:

On March 6, 1980, Sergeant Melvin Turner of the Wayne County Sheriff's Department, using a fictitious identity, engaged in a telephone conversation with individuals at 1703 Infantry Street, Detroit, Michigan. One of the persons participating in that conversation was identified as "Jess" or "Jesse." During the conversation, heroin was not specifically mentioned, but statements were made concerning quantity and price which led Turner to believe that the parties on the line were offering to sell him an amount of heroin. A meeting location in Saginaw, Michigan was tentatively agreed to by Turner and Jesse.

Sergeant Turner then contacted Special Agent James King of the Drug Enforcement Administration (DEA) who, in turn, contacted the Saginaw Police Department. The various law enforcement officers agreed to cooperate in investigating this matter.

Later the same day, March 6, 1980, Sergeant Turner received a phone call from

Jesse, on his undercover line, confirming a meeting location in Saginaw, Michigan, wherein Turner could test a sample of the substance which was to be the subject of the transaction. Jesse then gave Sergeant Turner a phone number where he could be reached upon Turner's arrival in Saginaw. Turner, acting on information provided by the Saginaw Police Department, then traced the phone number to the address of 3221 Harold Street, Saginaw, Michigan, the known residence of one "Jessie," a/k/a "Jesse Mandezs," a/k/a "Jesse Joe Mendoza." Turner, while still at his Detroit office, then prepared a search warrant and affidavit for the foregoing address and person.

At approximately 7:30 p.m. that evening, Sergeant Turner met with Special Agent King and members of the Saginaw Police Department at a restaurant in Saginaw. Turner was then transported to the home of Judge Gary McDonald of the Saginaw County Circuit Court who signed the warrant which Turner had earlier prepared.

At approximately 9:05 p.m. Sergeant Turner placed a phone call to Jesse and and finalized plans for a meeting. Shortly thereafter Turner, accompanied by another undercover officer, drove to the location and met with an individual later identified as Jesse Montez, and acquired a substance later identified as heroin. Upon delivery of the heroin, Jesse Montez was arrested. An amount of $427.00 in U.S. currency was seized from his person at the time of the arrest. After being taken into custody, Montez was informed that a search warrant had been obtained for 3221 Harold Street, Saginaw, Michigan. He was then taken to that location.

The search warrant was executed by Special Agent King of the DEA, Sergeant Turner, and various members of the Detroit Metropolitan Narcotics Squad and the Saginaw Police Department. Pursuant to the warrant the officers seized $21,860.00 in U.S. currency, one plastic zip-lock bag containing a brown lumpy substance later determined to contain 3.5% heroin, two scales, and assorted firearms. Montez, who was

present, stated that the seized currency was his money.

Following the search, all seized items were turned over to Special Agent King who later forwarded the suspected narcotics to the Chicago Regional Laboratory of the DEA.

Based on the foregoing facts, there are two central issues which must be resolved in determining whether the currency should be forfeited. They are:

I.) Whether the search warrant was valid; and

II.) Whether, even if the warrant is found invalid, there still exists sufficient independent evidence of probable cause to render the currency forfeit.

After outlining the statutory basis and procedural posture of a forfeiture action, the Court will address these issues.

III. *Statutory Basis and Procedure*

This action was brought pursuant to 21 U.S.C. § 881(a)(6) which provides, in pertinent part, that:

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter . . .

The procedural course which these actions are to follow is that provided for in 19 U.S.C. § 1615, as incorporated by 21 U.S.C. § 881(d), which provides, in pertinent part, that:

In all suits or actions . . . brought for the forfeiture of any vessel, vehicle, merchandise, or baggage seized under the provisions of any law relating to the collection of duties on imports or tonnage, where the property is claimed by any person, the

burden of proof shall lie upon such claimant ... Provided, that probable cause shall be first shown for the institution of such suit or action, to be judged of by the court...

█ Based on these statutory provisions, the government must first establish probable cause to believe that the seized currency was money used in a manner proscribed by 21 U.S.C. § 881(a)(6). The probable cause necessary is a reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion. *United States v. One 1978 Chevrolet Impala Van*, 614 F.2d 983, 984 (CA 5, 1980); *United States v. One 1975 Mercedes 280S*, 590 F.2d 196, 199 (CA 6, 1978); *United States v. One 1975 Ford Pickup Truck*, 558 F.2d 755, 756 (CA 5, 1977); *United States v. One 1975 Chevrolet K–5 Blazer*, 495 F.Supp. 737, 740 (WD Mich, 1980).

If the government makes a sufficient showing of probable cause the burden, in the usual case, would then shift to the claimant to show, by a preponderance of the evidence, that the currency is not subject to forfeit. *United States v. One 1975 Ford Pickup Truck, supra*. In this case, however, the claimant offers no proofs, rather, he merely challenges the government's ability to make a requisite probable cause showing. Therefore, as stipulated by the claimant, the ultimate issue in this action is whether the government's proofs establish probable cause for forfeiture under 21 U.S.C. § 881(a)(6).

Before reaching the ultimate issue, the Court must decide whether the search warrant was valid. A decision on this question will determine what proofs the Court may consider in deciding whether the government has made a sufficient showing of probable cause. If the warrant is found to be valid, the Court may consider the items seized along with the currency as evidence of probable cause. If the warrant is found to be invalid, such evidence may not be considered as it is subject to the exclusionary rule. *One Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).

IV. *Validity of the Warrant*

█ In ruling on the validity of the warrant the Court must first decide whether the search was a federal search, to which the requirements of FR Crim P 41 would apply; or a state search, to which the standards of the Fourth Amendment would apply. *See United States v. Burke*, 517 F.2d 377, 383 n. 6 (CA 2, 1975).

The government asserts that the search herein was a state search. It points to the following facts to support its position: The investigation was initiated by state officers, the warrant was prepared by a state officer on state forms, the warrant was signed by a state judge, the violation alleged in the warrant was of state law, and the investigation was controlled by state officers up to the time the warrant was executed.

The claimant maintains that the search was a federal search. He points to the following facts to support his assertion: A federal officer participated in the investigation, he personally involved the Saginaw Police Department in this matter, he met with the state officers at a restaurant in Saginaw prior to the arrest of the defendant, he participated in the execution of the warrant, and he took control of all evidence seized and submitted it to other federal officers for processing and analysis. In addition, claimant points to the fact that the defendant was lodged in federal custody and only a federal prosecution resulted.

The question of whether a search is a federal search or a state search has a long history. It has been addressed by the Supreme Court on various occasions, *see e.g. Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927); by the Sixth Circuit, *United States v. Searp*, 586 F.2d 1117 (CA 6, 1978), *cert. denied*, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979); by several of the other circuits, *see e.g. United States v. Rios*, 611 F.2d 1335 (CA 10, 1979); *United States v. Brown*, 584 F.2d 252 (CA 8, 1972); *United*

*States v. Burke*, 517 F.2d 377 (CA 2, 1975); and by Judge Pratt in this district, *United States v. Townsend*, 394 F.Supp. 736 (ED Mich, 1975).

The legal standard to be applied in deciding this question was enunciated by Justice Frankfurter in *Lustig v. United States*, 338 U.S. at 79, 69 S.Ct. at 1374, as follows:

> The decisive factor . . . is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it . . . Evidence secured through such federal participation is inadmissible.

In *United States v. Searp*, 586 F.2d at 1121, Judge Peck of the Sixth Circuit amplified this legal standard by holding that:

> Thus the temptation to federal officers to take advantage of more lenient or more flexible state procedures in the course of conducting a federal investigation is still a reality. While it is important not to stifle cooperation between federal and state officers, we think it is clear that federal officers, investigating a federal crime, must comply with the federal rules governing their conduct . . . . when a federal officer has participated in a search in an official capacity, his or her conduct, and thus the legality of the search, is to be judged by federal standards.

■ Based on these legal principles and the precedent reflected in the above cited cases, as applied to the present set of facts, the Court finds that the search in this case was a federal search. As such it is to be judged by Fr Crim P 41, the requirements of which clearly have not been satisfied in this case.

■ Fr Crim P 41(c) provides, in pertinent part, that:

> The warrant shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law

thereof. . . . It shall command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property or person specified. The warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime. It shall designate a federal magistrate to whom it shall be returned.

The warrant in this case was directed to state officers, stated no time limits, did not authorize a night search, although it is clear that that is when the warrant was executed, and was not returned to a federal magistrate or, apparently, to any judicial officer. In light of these cumulative deviations from the requirements of Rule 41, the Court finds that the search warrant used in this case was invalid. Accordingly, all evidence seized pursuant thereto will be excluded from consideration by the Court in its decision whether the $22,287.00 in U.S. currency is subject to forfeit. *One Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).

V. *Probable Cause for Forfeiture*

■ Having excluded the seized items— $21,860.00 in U.S. currency, a bag of heroin, two scales, and assorted firearms—from consideration of whether the government has established sufficient probable cause for forfeiture, the government's independent evidence of probable cause that the currency was used for the purposes proscribed by 21 U.S.C. § 881(a)(6) is limited to statements made to Sergeant Turner over the telephone by individuals at the Infantry Street address in Detroit on March 6, 1980. Such statements were recorded by the government and admitted into evidence at the criminal trial of Jesse Montez and therefore may be considered by the Court in this related civil action. *United States v. One 1975 Chevrolet K–5 Blazer*, 495 F.Supp. 737, 741 (WD Mich, 1980).

When the taped telephone conversations were played at the criminal trial, the government provided the jury with a transcript to aid them in following the tape.

The tape, not the transcript, was admitted into evidence. *United States v. Vinson*, 606 F.2d 149, 155 n. 12 (CA 6, 1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). The Court recalls, however, that the tape was an accurate transcription of the recorded conversation. For purposes of convenience therefore, the Court has reviewed the transcript in making its probable cause determination in this matter.

The portions of the transcript which the government points to as providing sufficient probable cause for forfeiture are two exchanges, both involving Sergeant Turner, using a fictitious identity (Charles); one with a person named Johnny and one with a person named Jesse. The first of these exchanges went as follows:

Sgt. Turner: Hey, well, I, ah, tell me something, what's happening on those prices now man?

Johnny: Oh, it depends what you talkin about.

Sgt. Turner: Okay, what I'm talkin about is an eighth, but, ah . . .

Johnny: An eighth.

Sgt. Turner: Yeah.

Johnny: Well, what now are you talkin bout on the L B or a half L B or what?

Sgt. Turner: Yeah on the L B.

Johnny: L B.

Yeah.

Johnny: I'm figuring I'm figuring out now, wait a minute.

Sgt. Turner: Okay.

Johnny: Oh, bout, oh, bout, let's see, seven about, ah, about nineteen, nineteen five.

Sgt. Turner: Nineteen five.

Johnny: Yeah, maybe nineteen five, maybe twenty, you know, cause like a, it, ah, it ain't no garbage you known what I'm talking about.

The second exchange went similarly:

Jesse: Hello.

Sgt. Turner: Hey Jess, what's happening?

Jesse: Who is this Charles?

Sgt. Turner: Yeah.

Jesse: Well, I don't know you but anyway listen, ah, right now we, we got about, ah, 10 or 12 O Z's on hand, you know?

Sgt. Turner: Um huh.

Jesse: But, if you know that's what we got left, but, ah, I got I've got, I don't have anything with me, I brought some up here for somebody else, but, ah, you know, they took it all.

Sgt. Turner: Um huh.

Jesse: And, ah, I'm I'm a have to be leaving here in about half an hour or an hour and I gotta go back up north and then I got a split from there.

Sgt. Turner: Well

Jesse: Cause, you know, um, there's a couple people, you know, that's supposed to get back with me later on today on that package.

Sgt. Turner: Uh hum.

Jesse: But a the way I take care of business, you know, money talks, first come first served.

As was established at trial, the terms "lb", "oz", and "eighth" refer to sizes or quantities; and the figures discussed such as "nineteen five," were understood by Sergeant Turner to refer to prices or dollar amounts. Claimant's brief regarding forfeiture, at page 4, concedes that these terms refer to quantities and prices.

■ The Court believes that these proofs constitute sufficient independent evidence of probable cause to establish that the currency involved was furnished or intended to be furnished in exchange for a controlled substance, or used or intended to be used to facilitate a drug transaction. 21 U.S.C. § 881(a)(6). As was established at trial, the terminology used by Johnny and Jesse to discuss quantities are common in illicit drug trading circles. The money seized, both from the person and residence of Jesse Montez, totalling $22,287.00, an unusually large amount of cash for any individual to have on hand, is very close to the price of "nineteen five" ($19,500.00) noted by Johnny as the cost of an "lb" (pound of heroin). Jesse himself stated that he "brought some up here for somebody else, but, ah, you

know they took it all." Given that Jesse, as self-proclaimed, knows how to "take care of business" and is a person for whom "money talks", it is reasonable to assume that he was *paid* for the substance which was all taken by "somebody else." And given the evidence adduced at trial regarding the time of day when the events of this action took place, it is unlikely that Jesse would have been able to deposit any such payment in the bank. This independent evidence, taken in the context of all the statements made, presents a reasonable ground for belief, which is more than mere suspicion, that Jesse Montez used or intended to use this currency in a manner proscribed by 21 U.S.C. § 881(a)(6). *United States v. One 1978 Chevrolet Impala Van*, 614 F.2d 983, 984 (CA 5, 1980).

Accordingly, for all the reasons expressed herein, the Court hereby orders the amount of $22,287.00 in U.S. currency forfeited to the United States Government. Judgment will be entered in accordance with this opinion.

IT IS SO ORDERED.