UNITED STATES of America,

v.

RW PROFESSIONAL LEASING SERVICES CORP., also known as "Professional Leasing Services," Rochelle Besser, also known as "Rochelle Drayer," Barry Drayer, Roger Drayer, Adam Drayer, Susan Cottrell, Myrna Katz, and Stephen Barker, Defendants.

No. 02 CV 767(ADS)(MLO).

United States District Court, E.D. New York.

May 4, 2004.

Roslynn R. Mauskopf, by Geoffrey R. Kaiser, Assistant U.S. Attorney, Islip, NY, United States Attorney.

Frankel & Abrams, by Stuart E. Abrams, of Counsel, New York City, for Defendant RW Professional Leasing Services Corp.

Simon & Partners LLP, by Bradley D. Simon, Kenneth C. Murphy, of Counsel, New York City, for the Defendant Rochelle Besser.

Stephen L. Cohen, Chatham, NY, for Defendant Barry Drayer.

Jerald Rosenthal, Ghent, NY, for Defendant Roger Drayer.

Maurice Sieradzki, New York City, for Defendant Adam Drayer.

Gotlin & Jaffe, by Daniel Gotlin, of Counsel, New York City, for Defendant Susan Cottrell.

John S. Wallenstein, Mineola, NY, for Defendant Myrna Katz.

Terrence P. Buckley, Islandia, NY, for Defendant Stephen Barker.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case involves charges of conspiracy to commit bank fraud and wire fraud and money laundering. Presently before the Court are the following motions by RW Professional Leasing Services, Corp. ("PLS"), Rochelle Besser, Barry Drayer, Roger Drayer, Adam Drayer, Susan Cottrell, and Stephen Barker (collectively, the "defendants"): (1) to suppress documents obtained directly by a confidential source referred to as "CS-1" in the Government's search warrant application, and any evidence seized by the Government from PLS's office; (2) to suppress Roger Drayer's post-arrest statements; (3) to preclude evidence concerning the alleged fraudulent loans obtained by PLS on behalf of Hospitality Services of Middle Tennessee ("HSMT"); (4) to dismiss the indictment with respect to defendant Adam Drayer, or alternatively, to sever his trial; (5) for the production of all Brady and Giglio materials; (6) for an order directing

the Government to provide a bill of particulars; and (7) for an order directing the Government to provide statements and the grand jury testimony of PLS employees.

## I. BACKGROUND

On or about April 2, 2003, along with Payaddi Shivashankar, the defendants were indicted and charged with one count of conspiracy to commit bank fraud and wire fraud, 18 U.S.C. § 371, five counts of bank fraud, 18 U.S.C. § 1344, and one count of money laundering, 18 U.S.C. § 1986(h). The following facts are taken from the superceding indictment ("indictment"). PLS maintained business locations in Island Park, New York, and Wellesley, Massachusetts. The indictment charges, in relevant part, that Rochelle Besser, Barry Drayer, Susan Cottrell, Roger Drayer, and Roger Drayer's son Adam Drayer (collectively, the "PLS defendants") operated a medical equipment financing company, in which they arranged financing for the leasing of medical equipment by medical providers and supplied medical providers with working capital loans. PLS obtained loans from financial institutions for the purported purpose of purchasing medical equipment that would be leased to medical providers. In many instances, the leases and the medical equipment served as collateral for the loans.

The indictment charges that PLS devised a scheme to provide the financial institutions with sham documentation creating the false impression that the medical providers were leasing equipment from PLS and that PLS issued phony equipment invoices directly to the medical providers for payments due under the lease. The indictment further charges that the PLS defendants, among other things: (1) intentionally retained lease prepayments, rather than remitting them to the financial institutions; (2) concealed prepayments and defaults by medical providers by creating false checks that were designed to make it appear as though the medical providers were continuing to make payments under the leases; (3) fraudulently induced lenders to fund multiple loans on the basis of a single lease; (4) obtained loans from lenders on the basis of leases that had been cancelled by medical providers; (5) presented escrow agreements to banks to induce them to fund loans, knowing that escrow accounts would not be established and no funds would be held in escrow for the banks; and (6) converted loan proceeds to PLS's own use.

The indictment provides that, instead of establishing escrow accounts for the leases being financed by the financial institutions as required by the escrow agreements, PLS maintained one bank account that received approximately $92 million in loan proceeds wired by the lending institutions, and a second bank account known as the "E–Account," which was used by PLS as an operating account to receive lease payments and lease prepayments from the medical providers and for other purposes. The bank account and the E–Account were maintained by PLS at the same financial institution.

After the loan proceeds were wired into the first account, they were transferred by PLS into the E–Account, where they were commingled with lease payments and lease prepayments. Instead of using the loan proceeds for the purchase of medical equipment, as PLS had promised to do, the PLS defendants converted a substantial portion of the loan proceeds to their own uses. In particular, the commingled funds were transferred by check or wire from the E–Account to (1) pay financial obligations of PLS; (2) make lease payments in order to conceal the medical providers' default status from lenders; and (3) another account maintained by PLS in order to disguise the proceeds and facilitate

their conversions. The indictment states that the PLS defendants fraudulently converted at least the sum of $28 million.

## II. DISCUSSION

### A. Motion to Suppress all Evidence obtained by "CS-1"

The defendants identify a confidential source ("CS-1") as former PLS employee Frank Zambaras. They argue that Zambaras acted as a de facto Government agent and that, therefore, all items seized by him and all evidence derived from those items, including items seized pursuant to the search warrant, should be suppressed. Alternatively, the defendants request an evidentiary hearing to determine whether Zambaras acted as a Government instrument or agent.

■■■ The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. It is well-settled that the "surreptitious search of premises by a private party does not violate the Fourth Amendment" unless such individual is acting as an instrument or agent of the government in obtaining evidence. *United States v. Bennett*, 709 F.2d 803, 805 (2d Cir.1983). The Supreme Court has made clear that it is " 'immaterial' whether the government originated the idea for a search or joined it while it was in progress." *United States v. Knoll*, 16 F.3d 1313, 1320 (2d Cir.1994) (quoting *Lustig v. United States*, 338 U.S. 74, 78–79, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949)). If the government " 'was in it before the object of the search was completely accomplished [by the private party, it] must be deemed to have participated in it.' " *Id.* (quoting *Lustig*, 338 U.S. at 78–79, 69 S.Ct. 1372). Thus, the critical issue is "the point in time when the object of the search has been completed. If the object has been real-ized, the government cannot later become a party to it. By the same token, it may not expand the scope of an ongoing private search unless it has an independent right to do so." *Id.*

An evidentiary hearing on a motion to suppress "ordinarily is required if the moving papers are sufficiently definite, specific, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir.1992) (citations and quotations omitted). A defendant seeking a hearing on a suppression motion bears the burden of showing the existence of disputed issues of material fact. *See id.* at 338. However, a district court is not required to hold an evidentiary hearing if the defendant's "moving papers did not state sufficient facts which, if proven, would have required the granting of the relief requested." *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir.1969). Further, a court need not hold an evidentiary hearing when the "defendant's allegations are general and conclusory or are based on suspicion and conjecture." *United States v. Wallace*, No. 97 CR 975, 1998 WL 401534, at *30 (S.D.N.Y. July 17, 1998) (citation omitted).

■■■ According to the defendants, the circumstances surrounding the recovery of items by Zambaras from the PLS office "lead to the conclusion that the FBI directed or at least encouraged the actions of Zambaras in his surreptitious search and seizure of such items." The defendants point out that, in a June 20, 2002 complaint and affidavit, Agent Rondie Peiscop–Grau stated that Zambaras "has been supplying the [Government] with information and documents" about PLS's operation since on or about June 13, 2002. Agent Peiscop–Grau further stated that Zambaras provided a file "relating to OD–1, an op-

tometrist from California" and "four other files reflecting the defendants' rental of boxes from Mail Boxes, Etc."

In addition, the defendants assert that a photocopy of a property receipt reveals that Zambaras provided several items to the Government on June 18, 2002, three days prior to the arrest of Barry Drayer, Rochelle Besser and Roger Drayer. The defendants also contend that a photocopy of a computer disk appears to show that, at some point, Zambaras provided the Government with an actual computer disk containing copies of RW checks. The defendants state that this disk was not generated by any of the PLS defendants. Based on this, the defendants contend that the computer disk and the other documents were seized by Zambaras without PLS's authorization and with the knowledge of the Government.

Further, the defendants state that, on or about June 13, 2002, Zambaras was terminated by PLS. Several days later, when Zambaras was no longer on the payroll, several PLS employees observed him at the PLS office making an "unusual" number of photocopies. In an April 1, 2004 supplemental affidavit, Roger Drayer states that he saw Zambaras at the photocopy machine for "several hours." According to the defendants, Zambaras was copying and stealing PLS files. Further, in a February 12, 2004 affidavit, Domenica Califano, another tenant in the building in which PLS is located, asserts that Zambaras was observed on June 21, 2002 handing the FBI agents a computer disk and accompanying FBI agents, while a search warrant was being executed inside the PLS office.

In response, the Government contends that there is nothing in Agent Rondie–Grau's affidavit to suggest when, where, or how the documents supplied by Zambaras were obtained. The Government further contends that there is no evidence that the FBI directed or approved a private search of PLS's office.

In the Court's view, the defendants have made a sufficient showing that contested issues of fact exist regarding whether Zambaras was working on behalf of the Government at the time he obtained documents. In sum, the defendants contend that Zambaras was acting at the behest of the Government, based on the following: (1) the language in the affidavit of Agent Peiscop–Grau reveals that Zambaras provided the Government with information and documents in the week preceding the search of the PLS office on June 21, 2002; (2) Roger Drayer's observation regarding the "unusual amount" of photocopying by Zambaras after the FBI met with him on June 13, 2002; (3) the FBI receipt indicating Zambaras gave documents to Agent Peiscop–Grau on June 18, 2002; (4) the copy of the computer disk that had "PLS Checks" written upon it but was not generated by any of the PLS defendants; and (5) the observations of an independent third-party witness that Zambaras was actually assisting the FBI in the execution of the search warrant. Based on these allegations, the Court finds that an evidentiary hearing is necessary to determine whether there was Government involvement in Zambaras's seizure of the documents. Accordingly, United States Magistrate Judge Michael L. Orenstein is requested to conduct a suppression hearing with regard to this issue at his earliest convenience and report to the Court. The Court will defer its decision on this motion until after the determination of the suppression hearing.

### B. The Motion to Suppress Roger Drayer's Post–Arrest Statement

#### 1. As to Voluntariness

The defendants moves to suppress Roger Drayer's post-arrest statements made

on June 21, 2002, to FBI Agents Vincent Gerardi and Michael Lender, which were memorialized by the agents in an FBI form 302. The defendants argue that his statements should be suppressed on the grounds that (1) they were involuntary; (2) they were obtained in violation of his Fifth Amendment right to counsel; and (3) admitting the statements would violate the Bruton rule.

■ The Fifth Amendment right against self-incrimination requires a court to exclude from criminal proceedings involuntary statements produced by government threats or coercion. *Green v. Scully,* 850 F.2d 894, 900 (2d Cir.), *cert. denied,* 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). Because custodial interrogation is inherently coercive, *see Dickerson v. United States,* 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), law enforcement officers must provide a suspect with Miranda warnings prior to interrogation to safeguard a defendant's privilege against self incrimination. *United States v. Ramirez,* 79 F.3d 298, 304 (2d Cir.), *cert. denied,* 519 U.S. 850, 117 S.Ct. 140, 136 L.Ed.2d 87 (1996). Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

■ To determine whether a defendant waived his Fifth Amendment rights, the Court must decide whether the waiver was made with the "full awareness of the right being waived and of the consequences of waiving that right," *United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir.1995), and whether the confession or statement was the "product of a free and deliberate choice rather than intimidation, coercion,

or deception," *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). A defendant's confession or statement "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion by any improper influence." *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Coercion may be found where a defendant's statement is "obtained under circumstances that overbear the defendant's will at the time it is given. . . ." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991). Whether a statement is voluntarily made or a product of government coercion depends on the totality of the circumstances. *United States v. Gaines,* 295 F.3d 293, 298 (2d Cir.2002) (citing *Tankleff v. Senkowski,* 135 F.3d 235, 244–45 (2d Cir.1998)).

■ Promises of leniency, without more, do not invalidate a Miranda waiver. *See United States v. Guarno,* 819 F.2d 28, 31 (2d Cir.1987). Although material misrepresentations based on unfulfillable or other improper promises might overbear a defendant's will, *see United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir.1995), "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.'" *United States v. Bye,* 919 F.2d 6, 9 (2d Cir.1990) (quoting *Guarno,* 819 F.2d at 31). Thus, whether promises of leniency for his children overbore the defendant's will in this case, thereby rendering his waiver involuntary, depends on the promises made.

■ In the present case, the defendants apparently concede that Miranda warnings were given. Rather, the defendants contend that Roger Drayer's statements to the FBI agents were involuntary. As noted above, one of the factors the Court must consider when determining whether a statement was voluntarily made is

whether the government agents know that their conduct is reasonably likely to elicit an incriminating response from the suspect. *Rhode Island,* 446 U.S. at 301, 100 S.Ct. 1682.

According to the defendants, when Roger Drayer was arrested, FBI agents handcuffed him in front of his son, Adam Drayer, and warned Adam "you too are a hair away from being arrested." Shortly thereafter, the agents informed Roger Drayer that his daughter, Jennifer Tarantino, was also going to be arrested that day. He was then transported to FBI headquarters where he indicated that he would need an attorney. Before an attorney was provided, the defendants contend that one of the FBI agents "implied" that his children Adam Drayer and Jennifer Tarantino would go to jail if he did not make a statement and tell them about PLS's operation. Based on these circumstances, the defendants contend that Roger Drayer was coerced to make a statement because of concern for his children.

In response, the Government denies that Roger Drayer's statement was the product of coercion. Any statements made to Roger Drayer by the FBI, asserts the Government, were in the nature of permissible and truthful advice concerning his post-arrest circumstances.

▓▓▓▓ The Court finds that disputed issues of fact exist regarding the circumstances in which the Government obtained Roger Drayer's statements. A defendant's statement that is induced by government threats to arrest members of the suspect's family may render his statement involuntary. *See, e.g., Rogers v. Richmond,* 365 U.S. 534, 544–48, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (finding that a confession was coerced because the defendant was told his wife would be taken in for questioning). In the Court's view, the defendants have advanced enough facts to demonstrate that disputed issues of fact

exist regarding whether the agents exercised undue psychological pressure on Roger Drayer so that his will was overcome at the time he made his statements, thereby rendering his statements involuntary. Because the parties dispute the circumstances surrounding Roger Drayer's statements, the Court concludes that it cannot decide the defendants' motion to suppress Roger Drayer's statements without an evidentiary hearing. Accordingly, United States Magistrate Judge Michael L. Orenstein is requested to conduct a suppression hearing and report to the Court with regard to the issue of voluntariness.

### 2. As to his Invocation of his Right to Counsel

Next, the defendants argue that the statements by Roger Drayer should be suppressed because they were elicited after he invoked his right to counsel. After Roger Drayer was arrested, he was placed in an FBI vehicle and driven to FBI headquarters. During the drive, one of the agents asked him if he had an attorney, to which he responded that he "would want an attorney appointed to me." According to the defendants, this amounted to a Fifth Amendment invocation of counsel under *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

On the other hand, the Government asserts that Roger Drayer's statement regarding the appointment of counsel referred to his Sixth Amendment right to have counsel appointed to defend him against the charges at issue. The Government contends that the statement was in response to a routine inquiry by an FBI agent who was seeking that information for purposes of his impending arraignment. The Government also asserts that this response was viewed as ambiguous and that, in any event, Roger Drayer vol-

untarily signed a written waiver form and consented to be interviewed.

It is well-settled that a Sixth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against the suspect, " 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *United States v. Smith*, 778 F.2d 925, 931–32 (2d Cir.1985) (citing *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). Here, the Court rejects the Government's argument that Roger Drayer's statement that he wanted to have an attorney appointed referred to his Sixth Amendment right. It is undisputed that this statement was made immediately after his arrest but before arraignment. The Second Circuit has held that the Sixth Amendment right to counsel does not arise at the time of the arrest. *Smith*, 778 F.2d at 932. Because the period in question was before the commencement of an adversary judicial proceeding, the Sixth Amendment is not applicable.

Rather, the issue turns on whether Roger Drayer's right to counsel under the Fifth Amendment was violated. As previously stated, the Fifth Amendment requires that, once a suspect is in custody and subject to interrogation, government agents must apprise the suspect of his right to contact an attorney, and to have an attorney present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 467–71, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Edwards*, the Supreme Court held that, once the right to counsel is invoked, the interrogation must cease until counsel is present, unless the suspect thereafter indicates a waiver by initiating further communication with law enforcement. 451 U.S. at 484–85, 101 S.Ct. 1880. A defendant may invoke his right to counsel "in any manner and at any stage of the pro-

cess" that counsel is desired. *Miranda*, 384 U.S. at 444–45, 86 S.Ct. 1602.

Invocation of the Fifth Amendment requires the suspect to make "some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Reference to an attorney that is ambiguous or equivocal is insufficient to invoke the Fifth Amendment right to cause law enforcement to cease their questioning. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). In addition, the Court is mindful that it "must give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *United States v. Quiroz*, 13 F.3d 505, 511 (2d Cir.1993) (internal quotations and citation omitted). Indeed, any "doubts must be resolved in favor of protecting the constitutional claim." *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).

In this case, there is no dispute that Roger Drayer stated that he "would want an attorney appointed for me." The Court finds that his statement was an unambiguous and unequivocal assertion of his right to and need for counsel. His statement was sufficient to put the FBI agents on notice that he was requesting counsel and that, therefore, they were required to refrain from questioning him until counsel was made available to him. *See Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880. Nevertheless, this rule does not "foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussion with the authorities." *Minnick v. Mississippi*, 498 U.S. 146, 156, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

The parties dispute whether Roger Drayer voluntarily signed a written waiver form and consented to be interviewed. Again, the defendants assert that he was coerced to answer questions due to his concern for his children. Because the parties dispute whether Roger Drayer voluntarily waived his Fifth Amendment right to counsel, the Court will defer decision on this issue, as it finds that a suppression hearing is necessary. Accordingly, United States Magistrate Judge Michael L. Orenstein is requested to conduct a suppression hearing and report to the Court with regard to the waiver issue.

### 3. As to the Bruton Rule

▮ Finally, the defendants argue that Roger Drayer's statements to the FBI agents must be precluded pursuant to the rule in *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton*, the Supreme Court held that the government is prohibited from introducing a defendant's statement at trial if it implicates a co-defendant in a joint trial because the co-defendant would be denied his Sixth Amendment right to confront his accuser. *Id.* at 128, 88 S.Ct. 1620. The Supreme Court later limited the Bruton rule, holding that the Sixth Amendment is not violated where a proper limiting instruction is given to the jury not to consider the statement against the non-declarant and the statement is redacted to eliminate the co-defendant's name and any reference to his or her existence. *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The statement must be appropriately redacted so that it does not in any way indicate the identity or existence of the deleted code-fendant. *Gray v. Maryland*, 523 U.S. 185, 196, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) ("we conclude that *Richardson* placed outside the scope of Bruton's Rule those statements that incriminate inferentially"); *see also United States v. Smith*, 198 F.3d 377, 385 (2d Cir.1999) ("In addition, the plea allocution was not incriminating on its face because it did not directly implicate Smith. Therefore, we find no violation of Gray.").

▮ Here, the Government does not oppose redacting the statements as provided by *Bruton, Richardson*, and *Gray* and does not object to a limiting instruction being given to the jury regarding the use of the statements. Nevertheless, the defendants argue that, because this case involves a family business, there is no way to separate Roger Drayer's statements from the accusation against his co-defendants. The Government contends, and the Court agrees, that there is no rule barring the admission of a defendant's inculpatory statement merely because some co-defendants are members of the defendant's family. However, at this time, the Court declines to decide the potential Bruton issues. Given the absence of a proposed redacted statement, the Court is unable to determine whether, on its face, the redacted statement sufficiently complies with the standards set forth in *Bruton, Richardson*, and *Gray*. Therefore, the defendants' motion to suppress Roger Drayer's statement on the ground that its admission would allegedly violate the Bruton rule is denied without prejudice and with leave to renew.

### C. Motion to Suppress Evidence concerning HSMT

▮ The defendants state that they have been charged with two counts of conspiracy: conspiracy to commit bank fraud and wire fraud (count one) and conspiracy to commit money laundering (count seven). The defendants contend that there will be evidence presented at trial concerning a third conspiracy. According to the defendants, this third conspiracy relates to allegations concerning money funded to

HSMT. The defendants assert that Payaddi Shivashankar, an HSMT employee, is at the center of these allegations. For example, the defendants state that, in the loan applications, Shivashankar allegedly falsely represented that the money was to be used to finance the purchase of medical equipment for HSMT and that the indictment alleges that the HSMT loans contained forged signatures of doctors. The defendants contend that the actions by Shivashankar and the HSMT partners were undertaken independent of the PLS defendants. The defendants further contend that there is no evidence that the PLS defendants were aware of the forged signatures or any other misconduct on the part of Shivashankar or any other principals or employees of HSMT. Because the indictment does not charge this separate conspiracy, argue the defendants, all evidence concerning the HSMT loans should be precluded at the trial.

The defendants' argument is without merit. As the Government properly points out, whether the PLS defendants knew that Shivashankar or HSMT principals or employees forged signatures in order to further the scheme is immaterial. *See United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir.2000) ("There is no rule requiring the government to prove that a conspirator knew of all criminal acts by insiders in furtherance of the conspiracy."). In addition, the indictment here charged one conspiracy to defraud financial institutions by obtaining financing under false pretenses and describes a scheme in which the PLS defendants and Shivashankar agreed to achieve that objective on behalf of HSMT. Furthermore, even assuming proof of multiple conspiracies, generally, this is a question of fact for the jury. *United States v. Vazquez*, 113 F.3d 383, 386 (2d Cir.1997). Accordingly, the defendants' motion to suppress all the evidence concerning the HSMT loans at trial is denied.

### D. Motion to Dismiss the Indictment against Adam Drayer or to Sever his Trial

 The defendants move to dismiss the indictment against Adam Drayer on the ground that "there is insufficient evidence to connect Adam Drayer to the conspiracy." Insufficiency of the evidence before a grand jury is an insufficient ground to dismiss a facially valid indictment. *See United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir.1989) ("An indictment, if valid on its face, may not be challenged on the ground that it is based on inadequate evidence.").

 In addition, no defects in the indictment against Adam Drayer warrant dismissal. An indictment need only track the language of the statute charged and state the approximate time and place of the alleged crime. *See United States v. Pirro*, 212 F.3d 86, 92 (2d Cir.2000) ("We have consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.") (internal quotations and citations omitted). Because the indictment here more than satisfies these requirements, the motion to dismiss the indictment against Adam Drayer is denied.

In the alternative, pursuant to Rule 14 of the Federal Rules of Criminal Procedure, the defendants argue that the Court should sever Adam Drayer's trial from that of the remaining defendants because joint trials of these offenses and these defendants would be severely prejudicial. In particular, the defendants argue that, due to the familial relationships between Adam Drayer and his co-defendants and his minor role in the alleged offenses, severance is necessary.

 Rule 14 empowers a court to grant a severance "if it appears that a

defendant ... is prejudiced by a joinder of ... defendants ... for trial together...." Fed.R.Crim.P. 14. A court should sever trials of co-defendants under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or lack of guilt. *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *United States v. Rahman,* 189 F.3d 88, 122 (2d Cir.1999). Even if some prejudice is shown, Rule 14 does not require severance. *See United States v. Haynes,* 16 F.3d 29, 32 (2d Cir. 1994). Rather, "limiting instructions often will suffice to cure any risk of prejudice." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933.

 The Court finds that severance is not necessary in this case. First, "differences in degree of guilt and possibly degree of notoriety" of defendants do not require that there be separate trials. *United States v. Aloi,* 511 F.2d 585, 598 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975). Indeed, "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Carson,* 702 F.2d 351, 367 (2d Cir.1983). Second, there is no reason to conclude that a jury would be unable to distinguish among family members in finding guilt or lack of guilt. Finally, even if the Court severed Adam Drayer's trial from that of his co-defendants, much of the evidence introduced in one trial to establish the conspiracy would be introduced in the other. *See United States v. Rosa,* 11 F.3d 315, 341 (2d Cir.1993) ("Evidence at the joint trial of alleged co-conspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."); *United States v. Muyet,* 945 F.Supp. 586, 596 (S.D.N.Y.1996) ("[E]ven if

the Court were to grant severance, much of the evidence regarding ... co-defendants' acts of violence would be admissible in ... [their] trial as proof of the existence and nature of the conspiracy.").

Moreover, to the extent that the evidence against one defendant may not relate to another, the Court will either redact or issue limiting instructions to cure any possible prejudice. *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. Thus, the Court finds that the defendants have not demonstrated the existence of a serious risk that a joint trial will compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or lack of guilt. *Id.; Rahman,* 189 F.3d at 122. Accordingly, the Court denies the motion by the defendants for severance as to defendant Adam Drayer.

### E. Motion to Produce Brady and Giglio Materials

 The defendants move for the disclosure of all Brady and Giglio materials. The Government acknowledges its duty to disclose exculpatory evidence pursuant to *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and represents that it will disclose any Brady materials when they become known. This representation by the Government is a sufficient basis for denying an application to compel disclosure under Brady.

 In addition, the Government states that it will abide by its obligations to disclose impeachment materials pursuant to *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Government further represents that it will disclose all Giglio material three days prior to the trial. As there is no pre-trial discovery right to Giglio materials, *see United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Court accepts the Government's

representation that it will produce such materials three days in advance of the trial. Accordingly, the Court denies the defendants' motion seeking disclosure of all Brady and Giglio material.

## F. Motion for a Bill of Particulars

Under Rule 7 of the Federal Rules of Criminal Procedure, a district court "may direct the filing of a bill of particulars." Fed.R.Civ.P. 7(f). A bill of particulars enables a defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling the defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted). In the defendants' request for a bill of particulars, they ask the Government, among other things, (1) to identify which allegedly fraudulent schemes correspond to which loans; (2) to explain how the loss figures were calculated; and (3) to state where the Government believes the proceeds of the crimes were secreted or what documents support the Government's case with respect to each individual allegation for each loan.

■■■ To determine a motion for a bill of particulars, " 'the important question is whether the information sought is necessary, not whether it is helpful.' " *United States v. Amendolara*, No. 01 CR 694, 2002 WL 31368279, at *4, 2002 U.S. Dist. LEXIS 19981, at *12 (S.D.N.Y. Oct. 15, 2002) (quoting *United States v. Facciolo*, 753 F.Supp. 449, 451 (S.D.N.Y.1990)) The decision to grant a motion for a bill of particulars is within the sound discretion of the district court. *See United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999) (citation omitted). Where the defendant is adequately informed of the charges against him, the Government need not particularize all of its evidence. *United States v.*

*Torres*, 901 F.2d 205, 234 (2d Cir.1990). "Acquisition of evidentiary detail is not a function of a bill of particulars." *Id.* Indeed, "[t]he proper scope and function of a bill of particulars is not to obtain disclosure of evidence or witnesses to be offered by the Government at trial...." *United States v. Strawberry*, 892 F.Supp. 519, 526 (S.D.N.Y.1995) (citing *United States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir.1973)).

■■■ In this case, the Court finds that the indictment sufficiently informs the defendants of the nature of the charges against them, namely a conspiracy to commit bank and wire fraud and a conspiracy to commit money laundering, thereby enabling them to prepare a defense in this trial. Moreover, the Government supplied a letter to the defendants, dated December 17, 2003, outlining the specific fraudulent loans that it intends to refer to at the trial. The Court agrees with the Government that the level of detail the defendants seek is neither required nor necessary to enable them to prepare a defense and avoid unfair surprise at the trial. Accordingly, the motion for a bill of particulars is denied.

## G. Motion to Provide all Statements and Grand Jury Testimony of PLS Employees

■■■ The defendants request that the Court order the Government to produce any statements of the defendants, including employees of PLS, in accordance with Rule 16 of the Federal Rules of Criminal Procedure. In particular, the defendants request the statements made by former employee Zambaras. Rule 16 entitles the defendants to discovery materials that the government intends to introduce at the trial or that is material to their defense. Fed.R.Crim.P. 16(a)(1). The Government represents that it will produce the statements of all prospective witnesses, including Zambaras, three days prior to the trial.

The Court has no basis to conclude that the Government will do otherwise with regard to its obligations under Rule 16. Accordingly, based on the Government's assurance, the defendants' request to order production of Rule 16 materials is denied.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the defendants' motion to suppress documents obtained by Frank Zambaras is **DEFERRED,** pending the outcome of the suppression hearing; and it is further

**ORDERED,** that the motion to suppress the documents is referred to United States Magistrate Judge Michael L. Orenstein, at his earliest convenience, to conduct a suppression hearing and report to the Court regarding whether Frank Zambaras was working as a government instrument or agent; and it is further

**ORDERED,** that the defendants' motion to suppress Roger Drayer's post-arrest statements made on June 21, 2002 to the FBI agents is **DEFERRED,** pending the outcome of the suppression hearing; and it is further

**ORDERED,** that the defendants' motion to suppress Roger Drayer's post-arrest statements is referred to United States Magistrate Judge Michael L. Orenstein to conduct a suppression hearing and report to the Court at his earliest convenience; and it is further

**ORDERED,** that the defendants' motion to preclude Roger Drayer's post-arrest statements based on the Bruton rule is **DENIED** without prejudice and with leave to renew; and it is further

**ORDERED,** that the defendants' motion to preclude evidence concerning HSMT is **DENIED;** and it is further

**ORDERED,** that the defendants' motion to dismiss the indictment with respect to defendant Adam Drayer or to sever his trial is **DENIED;** and it is further

**ORDERED,** that the defendants' motion for a production of all Brady and Giglio materials is **DENIED** on the condition stated; and it is further

**ORDERED,** that the defendants' motion for an order directing the Government to provide a bill of particulars is **DENIED;** and it is further

**ORDERED,** that the defendants' motion for an order directing the Government to provide the statements and the grand jury testimony of PLS employees pursuant to Fed.R.Civ.P. 16 is **DENIED** on the condition stated.

**SO ORDERED.**