In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1578

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FREDDELL BRYANT,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:11-CR-20034 — **Michael P. McCuskey**, *Judge.*

ARGUED DECEMBER 2, 2013 — DECIDED APRIL 17, 2014

Before BAUER and FLAUM, *Circuit Judges*, and VAN BOKKELEN, *District Judge.*[*]

VAN BOKKELEN, *District Judge.* The former gang leader Freddell Bryant elected to become an informant for the

---

[*] Of the Northern District of Indiana, sitting by designation.

United States to avoid an otherwise mandatory life sentence for a drug charge. He obtained immunity from the direct use of statements he would give the federal government under their agreement, though not from federal use of any admissions he might make in assisting state law enforcement.

Bryant went on to provide information to Illinois authorities under a separate agreement to which the United States was not a party. In this state agreement, Illinois promised him that his statements would not be used against him directly in "any criminal prosecution," but required in exchange that he tell the truth. Bryant confessed to the state authorities that he played a central role in a triple murder. Illinois then shared Bryant's cooperation statements with the United States. The United States proceeded to use the confessions directly, over his objection, to convict him of three murder counts. On appeal, Bryant attempts to show that this violated his contractual or constitutional rights. We disagree and therefore affirm the district court's denial of his pretrial motions, albeit not for all of the same reasons the district court cited.

## I. Background

In his heyday, Freddell Bryant, also known as Freddy Moe, was a cocaine-running "general" in the Black P. Stones gang. He plunged into desperation, however, when a federal grand jury indicted him on April 4, 2007, alleging: (1) conspiracy to distribute fifty grams or more of crack cocaine and 500 grams or more of cocaine, from October 2003 through March 2007; (2) possession of 500 grams or more of cocaine with intent to distribute it on July 12, 2004; (3) possession of a firearm in furtherance of a drug-

trafficking crime on October 17, 2003; and (4) possession of a firearm by a felon. Count 1 threatened particularly devastating consequences. Due to Bryant's two prior drug felonies and the allegation that at least fifty grams of crack were involved, the penalties statute mandated a sentence of "life imprisonment without release." *See* 21 U.S.C. § 841(b)(1)(A)(iii) (version effective from July 27, 2006, to April 14, 2009). To avoid life, he would have to beat count 1 on the merits or else earn the government's help by assisting it as an informant. *See* 18 U.S.C. § 3553(e) (enabling this method of evading an otherwise mandatory minimum sentence).

On the day before trial was set to begin, Bryant opted to plead guilty and cooperate. To hold their arrangement together, he and the federal government reduced to writing two separate but linked agreements. They had one agreement regarding Bryant's guilty plea and the government's sentencing recommendation. The second, the cooperation agreement, was put down in a letter from the assistant U.S. attorney to Bryant's then-lawyer. In it, the government immunized Bryant from the direct use of the statements he would provide in cooperating as required by the agreement:[1]

---

[1] Prosecutors have basically three forms of immunity to offer prospective informants. Immunity from direct use only—the least-generous variety, and the one Bryant accepted—roughly means merely that the cooperation statements themselves may not be introduced into evidence to prove the case-in-chief against the cooperator. A more protective agreement would also extend immunity from derivative use, so that prosecutors would have to show any evidence offered in their case-in-chief against the informant came from a legitimate source that was independent of the cooperation statements. And finally, the most

Dear … :

It is our understanding that your client, Freddell Bryant, desires to cooperate with the United States of America ("United States") in its efforts to enforce federal law on the condition that his statements are protected by a grant of use immunity to prevent him from facing any greater criminal liability as a result of cooperating. This letter is intended as a grant of conditional direct use immunity.

To avoid any misunderstanding, the specific terms of this grant of use immunity are:

1.  The United States agrees that no statement made or information provided pursuant to this agreement may be directly introduced as evidence against your client in any criminal case, including sentencing, excepting (1) a prosecution for making a false statement or perjury, and (2) use as impeachment or rebuttal evidence should he subsequently testify or take a factual position contrary to the information he provides. The United States will be free to make indirect, or derivative, use of his statements. This agreement means only that the fact he made certain incriminating

---

generous form of immunity for the cooperator is transactional immunity, which saves the cooperator from prosecution for offenses related to the cooperation statements. *See Kastigar v. United States*, 406 U.S. 441 (1972) (discussing the forms of immunity).

statements pursuant to this agreement may not itself be introduced as evidence against him. The United States will also remain free to discharge its duty to the court by informing the court of any information he provides. The court will be notified that such information was obtained pursuant to this grant of use immunity.

2. In return, your client agrees that he will provide <u>complete</u> and <u>truthful</u> information to law enforcement officials regarding his criminal conduct and everything he knows or has reason to believe about the criminal conduct of others … .

3. He agrees to provide <u>complete</u> and <u>truthful</u> testimony to any grand jury, trial jury, or judge in any proceeding in which he may be called to testify by the United States.

4. Your client further acknowledges and agrees that he understands that the United States's [*sic*] grant of use immunity herein is conditioned, in part, upon his complete compliance with paragraphs 2 and 3. Should he knowingly make any materially false statement or omission in providing information or testimony under this agreement, the United States will be entitled to use his statements and

evidence he provides, directly and indirectly, to institute and support a criminal prosecution for any offense, as well as a prosecution for giving false statements and perjury.

5. For instance, your client must neither conceal or [*sic*] minimize his own actions or involvement in any offense, nor conceal, minimize, fabricate, or exaggerate anyone else's actions or involvement in any offense. He must be completely truthful about the facts, whatever those may be.

\* \* \*

13. *Any violation of <u>any</u> part of this agreement by your client will void this agreement in its entirety and will release the United States from any obligation under this agreement.*

\* \* \*

This letter embodies the entirety of the United States's [*sic*] use immunity agreement with your client. No other promise or agreement exists between your client and the United States regarding immunity.

(Appellant's Separate App. 1–3.)

As required, Bryant assisted the government. For example, at a jury trial in August 2009, he testified to the drug trafficking of Keric Franklin, a member of his own gang.

However, Bryant's prospects took another turn for the worse in early 2010, when members of local law enforcement began to suspect him of involvement in a March 2007 triple murder in Danville, Illinois. The investigation prompted Bryant to enter into a second cooperation agreement; this time, with the Vermillion County State's Attorney. The United States did not review or become a party to the state agreement, and did not know of its specifics when executed on January 14, 2010.

In this second cooperation agreement, Bryant promised Illinois that he would "give a complete and truthful taped statement regarding the 2007 Danville triple homicide investigation …[;] specifically[,] a detailed account of who the shooters were and their roles in the murders." In addition to the foregoing "complete and truthful" language, the state cooperation agreement said explicitly that "any violation of any part of [the] Agreement by Fredell [*sic*] Bryant [would] void [the] Agreement in its entirety and … release the Vermillion County State's Attorney's Office from any obligation under [the] Agreement." Although this agreement recited Bryant's "acknowledge[ment]" that he was not receiving a grant of immunity, it also explained that anything Bryant would say "during the statement [could] not and [would] not be used directly against [him] in any criminal prosecution." Nowhere, however, did the state cooperation agreement require that Bryant testify.

With the two separate cooperation agreements in place, Bryant gave various members of state law-enforcement agencies two recorded statements about the triple murder; the first on January 14, 2010, and the second on February 24,

2010. On both occasions, Bryant admitted playing a central role. He explained that the victims, Rodney Pepper, Madisen Leverenz, and Tabreyan McCullough, were killed because "some drugs and money came up missing." But whereas during the first session Bryant claimed he himself shot all three victims, he later reinitiated contact with law enforcement to change his story, and did so on February 24, 2010. During this second session, Bryant said his associates, David Moore and Jerome Harris, were the ones who had shot Leverenz and McCullough.

Two months later, by the April 29, 2010, date of Bryant's drug sentencing, the government was satisfied with his cooperation. During an off-record, *in camera* portion of that hearing, the assistant U.S. attorney explained to the sentencing judge the nature and value of Bryant's service. Though an account of those *in camera* proceedings was not made available to this Court, we do know that on the record, the assistant U.S. attorney characterized Bryant as having "fulfilled" his "plea agreement and the agreements made in that plea agreement."[2] (Tr. Sentencing Hr'g, Apr. 29, 2010, 11:5–13.) When the judge asked about the possibility of a motion by the government for further reduction of Bryant's sentence to reward post-sentencing cooperation, *see* Fed. R. Crim. P. 35(b), the prosecutor replied, "I guess that's always a possibility, but it's … not been anticipated."

---

[2] We think it is apparent that by "agreements made in that plea agreement," the assistant U.S. attorney was referring in part to Bryant's federal cooperation agreement. (*See* Tr. Sentencing Hr'g, Apr. 29, 2010, 29:21–25 (Court deems the cooperation agreement "incorporated into the … signature on the plea agreement").)

The district court credited Bryant with providing truthful trial testimony against Keric Franklin, and summarized Bryant's assistance: "I certainly believe that Mr. Bryant fully cooperated [and] was truthful … ." (Tr. Sentencing Hr'g, Apr. 29, 2010, 16:24, 17:5, 17:11–12.) Noting the danger of reprisal that Bryant would face from Franklin in prison, the sentencing judge decided "the government's initial 20 percent [departure was] … too low given cooperation in State matters" and other proceedings where Bryant had given testimony that the judge deemed "fully truthful." (*Id.* 19:10–14.) The district court later referred a second time to Bryant's cooperation in "State matters" (*id.* 22:5), ultimately sentencing him to a total of 25 years on the drug-related charges.

After the drug sentencing, however, the uneasy partnership between Bryant and the authorities unraveled. In March 2011, the erstwhile gang general balked at the Vermillion County State's Attorney's Office's demand that he testify within a state grand jury's investigation of the Danville murders. Bryant cited his Fifth Amendment right against self-incrimination and pointed to the absence from his state cooperation agreement of a requirement that he testify at all. The Vermillion County State's Attorney's Office reacted by turning to the feds, inviting them to make use of their more stringent cooperation agreement to pursue their own investigation of the triple murder.

The United States did so, first by seeking to have Bryant testify before a federal grand jury about his previous statements regarding the Danville killings. Bryant initially refused, and then got a chance to consult with an attorney and refused again. The government advised him that it

considered him in breach of his federal cooperation agreement, and had him indicted on three counts of murder during the commission of a drug crime.

In a consolidated pretrial motion, Bryant objected to the use of his statements to Illinois authorities for purposes of indicting him or affirmatively proving the elements of the murder charges. He also sought a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), to require the government to show that its evidence derived from legitimate, non-immunized sources. District Judge Michael P. McCuskey denied the consolidated motion in its entirety, but expressed due process concerns over the possibility of the government exploiting a cooperation agreement with no specified termination date in another case by forcing an informant to testify many years after forming the deal. *See United States v. Bryant*, 905 F. Supp. 2d 877, 889 (C.D. Ill. 2012). The district court ruled:

> [B]ased on the facts in this case, including, but not limited to, the short duration between the two interviews and that Defendant was involved in drug trafficking at the time that he committed the homicide (and admitted as much in his statement to state prosecutors), thereby creating a factual nexus between the two indictments, … the federal authorities were permitted to leverage his earlier use immunity agreement to compel him to testify regarding the homicides. Because the federal cooperation agreement was still binding on Defendant, the Government requested Defendant testify before the grand jury, and

> Defendant refused to do so, Defendant must be found in breach of his cooperation agreement. Therefore, the Government is not bound by its previous promise not to use his statements against him.

*Id.* at 890. For those reasons, the motions to dismiss the indictment and to suppress the statements were denied. *Id.* Judge McCuskey denied the motion for a *Kastigar* hearing on the additional ground that Bryant's statements to Illinois authorities were, in the first place, beyond the scope of the immunity the United States had extended him. *Id.* at 891.

At trial, the government relied heavily on the self-incriminating statements Bryant had made to Illinois authorities. He took the stand and testified upon cross-examination that he had been lying in those statements:

> Q    Now, … I'm talking about the statements in January and February – those statements … that you made to [the officers], … they were asking you questions, correct?
>
> A    Yes.
>
> Q    And you fabricated those statements based on what sources of information?
>
> A    [Bryant's brother], my lawyer, the streets.
>
> Q    … And if you didn't know something, what did you do? Make it up?
>
> A    Yes.
>
> * * *

Q      Why would you say [the things you said to the officers in January and February 2010]?

A      Because at the time, … I was trying to get me a big downward departure, and I was trying to save the people that really did it.

*  *  *

Q      So you lied about –

A      Everything.

Q      No. You lied about your girlfriend sleeping with Face to explain why you were able to shoot three people? That's why?

A      I said I lied about the whole thing.

Q      Yeah. And I asked why you lied about this fact. You made up a story that TuTu was sleeping with Face for no reason?

A      I lied about the whole thing.

(Tr. Trial, Dec. 7, 2012, 155:13–157:6, 198:24–199:8.)

The jury convicted Bryant on all three counts, Judge McCuskey imposed three "consecutive" life sentences, and this appeal has followed.

## II. Discussion

Bryant claims the district court erred by allowing the federal government to prove its murder charges using the cooperation statements he gave state authorities. Those statements, he contends, could serve neither as the basis for indicting him nor at trial to prove the elements of the charges against him.

Bryant advances three supporting theories. First, he derives from his federal immunity agreement a right not to be prosecuted by the United States with the statements he gave Illinois. Second, he invokes the rights he had under the state agreement against the federal government on the view that the federal government became Illinois's agent. Finally, he cites the repudiation of the "silver platter" doctrine and argues that because Illinois could not prosecute him with the statements he provided it, and Illinois was the United States' direct source of the statements, the feds should likewise be barred from using them against him directly.

We approach the appeal *de novo* as regards the law, leaving undisturbed the district court's findings of fact unless they are clearly erroneous. *See United States v. Schuster*, 706 F.3d 800, 805 (7th Cir. 2013).

## A.

The method for interpreting plea and immunity agreements is very much like that applied to other contracts, unless special public-interest concerns, such as those for criminal defendants' constitutional rights, demand otherwise. *See United States v. Munoz*, 718 F.3d 726, 729 (7th Cir. 2013) (describing the approach for plea agreements); *United States v. Andreas*, 216 F.3d 645, 663 (7th Cir. 2000) ("Immunity agreements, like plea bargains, are interpreted as ordinary contracts in light of the parties' reasonable expectations at the time of contracting."). Thus, we start from the plain language of the agreement. *See United States v. Quintero*, 618 F.3d 746, 751 (7th Cir. 2010) (so proceeding); *United States v. Cobblah*, 118 F.3d 549, 551 (7th Cir. 1997) ("It is the language of the contract that binds the parties." (citing *United States v. Griffin*, 84 F.3d 912, 919 (7th Cir. 1996))).

Ambiguities go against the government as the drafting party. *See Munoz*, 718 F.3d at 729. The Restatement (Second) of the Law of Contracts often serves as a reliable authority for the contract principles in this context. *See, e.g., United States v. Cieslowski*, 410 F.3d 353, 362 (7th Cir. 2005) (citing the Restatement); *United States v. Wilson*, 390 F.3d 1003, 1012 (7th Cir. 2004) (same); *United States v. Williams*, 198 F.3d 988, 994 (7th Cir. 1999) (same).

The plain language here reveals that the feds never immunized statements Bryant would make in cooperation with other authorities. Consider that for Bryant's contract-based argument, he relies on the United States' promise that, with some inapplicable exceptions, "no statement made or information provided pursuant to th[e federal immunity] agreement may be directly introduced as evidence against [him] in any criminal case." But because that agreement was for Bryant "to cooperate with the United States … in its efforts to enforce federal law," the statements he gave Illinois authorities in ostensible support of their efforts to enforce state law were not provided "pursuant to" the federal agreement. This reading is appropriately literal. Allowing Bryant to lever the federal cooperation agreement to bar the government's use of his statements to Illinois would grant him the benefit of a bargain he never had. *Cf. United States v. Eliason*, 3 F.3d 1149, 1153 (7th Cir. 1993) ("If Eliason wanted to limit the use the federal government could make of the information he provided to Florida prosecutors, he and his counsel were obliged to follow the accepted procedures and at least make an attempt to obtain such an agreement or promise from the federal government.").

There is, therefore, no need to address the duration of Bryant's cooperation duties extensively, even though the parties have done so in considering whether Bryant breached his federal agreements after the drug sentencing. To be sure, "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1981). The questions of Bryant's breach and the duration of his cooperation duty are not essential to a determination of his rights against the United States, however, because the government did not promise him immunity from confessions made during state cooperation in the first place.

We take care to emphasize that Bryant's objection on appeal is to the government proving its murder charges with the once-immunized statements that Bryant gave *state* law enforcement in January and February of 2010. In this Court, that is, Bryant has *not* challenged any murder-trial use of admissions he made to *federal* authorities. (*See* Appellant's Br. 2 ("The issue presented for review is: Whether the district court erred in permitting the Government to indict Mr. Bryant based on Mr. Bryant's immunized statements given to state law enforcement and whether the district court further erred in permitting the Government to introduce those statements at trial."), 14 ("Although the specific legal bases for Mr. Bryant's motions are distinct, each turns on the same question: Did Mr. Bryant breach his cooperation agreement such that the Government could use the

immunized statements he made to state prosecutors?").)[3] Failure to develop an argument on appeal results in waiver even if the argument was presented to the district court. *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 783 (7th Cir. 2007) (quoting *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002)).[4]

Bryant has cited lots of case law emphasizing the role of the Due Process Clause in the analysis of immunity and plea agreements, but none that undermines our interpretation. We acknowledge that as a criminal defendant, Bryant enjoyed a due process-based right to fundamental fairness in the bargaining of his agreements with prosecutors. *See, e.g., United States v. Farmer*, 543 F.3d 363, 374 (7th Cir. 2008). He identified nothing unfair about the bargaining process in his case, however. Moreover, the substance of what he got in return for his cooperation—the chance to avoid a life

---

[3] Bryant has suggested that statements to the feds were off-topic, by noting that the federal authorities "never questioned [him] about the murders in the period between [his] 2007 guilty plea and 2010 sentencing." Bryant further posits that "[i]f the Government envisioned [his] federal cooperation to include testimony regarding the triple homicide … it stands to reason that the Government would have sought that cooperation before it made its sentencing recommendation … ." In sum, Bryant complains of federal use of statements given to state authorities, but his cooperation agreement does not support his grievance.

[4] If we had occasion to consider the legitimacy of the government's possible murder-trial use of the statements Bryant gave to federal authorities, the cooperation agreement would come back into play. We would then have to decide whether that agreement was ongoing and therefore breached when the government requisitioned Bryant's testimony before the federal grand jury.

sentence—was tremendously valuable. His analogy to vague criminal statutes fails, because it was his free and counseled personal choice to agree to the contractual terms that he now questions.

**B.**

Bryant's second principal argument has two steps. In step one, he offers the premise that the Vermillion County State's Attorney's Office violated his due process rights by prompting the federal murder prosecution with the protected statements he made during state cooperation. In step two, Bryant seeks to transfer responsibility for Illinois's alleged wrong to the federal government on the theory that it became Illinois's agent by investigating and prosecuting him at the state's suggestion. *Cf. United States v. Long*, 511 F.2d 878, 881–82 (7th Cir. 1975) (rejecting a defendant's claim that the federal government, as principal of a state, became bound by a state agreement).

Regardless of step one, Bryant encounters an insurmountable obstacle in step two. That is, the principal-agent relationship cannot arise without the agent's agreement to be controlled by the principal, Restatement (Third) of Agency § 1.01 (2006),[5] and Bryant lacks any

---

[5] Before publication of the third Restatement of the Law of Agency, this Court looked to its predecessor for guidance in considering the agency of prosecutors. *E.g.*, *Staten v. Neal*, 880 F.2d 962, 965 (7th Cir. 1989). The requirement of the agent's agreement to be controlled is contained within that predecessor, as well. *See* Restatement (Second) of Agency § 1 (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, *and consent by the other so to act*." (Emphasis added.))

evidence that the United States consented to be controlled by Illinois.

## C.

Closely related to Bryant's agency argument is his effort to draw upon what he characterizes as a corollary of the repudiation of the "silver platter" doctrine. *See Elkins v. United States*, 364 U.S. 206, 223 (1960). The "silver platter" label entered the parlance of federal criminal procedure in *Lustig v. United States*, 338 U.S. 74, 79 (1949). *Elkins*, 364 U.S. at 208 n.2. In *Lustig*, the Supreme Court stated: "[A] search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter." 338 U.S. at 78–79. Since *Elkins*, 364 U.S. at 223, however, the absence of federal involvement in the search no longer makes the evidence available for direct use by the government. "[E]vidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." *Id.* Though these passages frame the context as an illegal search, the underlying principles seem to apply with equal force beyond Fourth Amendment territory. In *Elkins*, the Supreme Court explained:

> "[A] conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law." Even less should the

> federal courts be accomplices in the willful disobedience of a Constitution they are sworn to uphold.

*Id.* (citation omitted) (quoting *McNabb v. United States*, 318 U.S. 332, 345 (1943)). This Court therefore declined an opportunity to distinguish *Elkins* as a search case in *United States v. Cozzi*, 613 F.3d 725, 732–33 (7th Cir. 2010), and proceeded to address the substance of an argument that the government should not be allowed to prosecute on the basis of an investigation spurred by a tip derived from compelled statements.

We follow suit in addressing the merits of Bryant's silver-platter claim, but find law enforcement's conduct readily distinguishable from such a scenario. For one reason, this doctrine has been applied only with respect to illegally obtained evidence. Here, Illinois authorities got Bryant's January and February 2010 statements legitimately, with his voluntary agreement, informed by the assistance of counsel. Second, and of equal importance, Illinois shared the statements with the federal government *before* Illinois allegedly breached its duty to Bryant by encouraging the federal murder investigation. So the United States had these arrows in its quiver regardless of Illinois's putative wrongdoing.[6] In other words, Bryant's silver-platter claim is missing but-for causation. Therefore, even if we overlook his

---

[6] If, on the other hand, knowledge of Bryant's involvement in the triple homicide did not reach federal authorities before the drug sentencing, then he failed to provide "complete and truthful information to [them] regarding his criminal conduct," in breach of his federal immunity agreement.

insistence that he was lying to the state authorities, we must reject this argument, as well.

### III. Conclusion

We AFFIRM the district court's order denying Bryant's consolidated pretrial motions.[7]

---

[7] As appointed counsel, Barry Levenstam, Matthew S. Hellman, and Ishan K. Bhabha have our thanks for skillfully representing the Appellant.